UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
PATRICK MCDOWELL,
                             :

               Petitioner,       **REPORT & RECOMMENDATION**

                             :

      v.                     09 Civ. 7887 (RO)(MHD)

                             :

PHILLIP D. HEATH,
Superintendent, Sing Sing     :
Correctional Facility,
                             :

             Respondent.     :
-------------------------------x

**TO THE HONORABLE RICHARD OWEN, U.S.D.J.:**

     USDC SDNY
     DOCUMENT
     ELECTRONICALLY FILED
     DOC #:
     DATE FILED: 3/14/12

Petitioner Patrick McDowell seeks a writ of habeas corpus to challenge his 2002 conviction in New York State Supreme Court, New York County, on two counts of third-degree robbery. Petitioner was adjudicated as a discretionary persistent offender and sentenced to two concurrent prison terms of fifteen years to life. He is currently incarcerated at Clinton Correctional Facility in Dannemora, New York.

Mr. McDowell filed his petition on September 11, 2009. (Pet. for a Writ of Habeas Corpus by a Person in State Custody ("Pet.") 14). He asserts two grounds in support of his application. He argues that New York's Discretionary Persistent Offender Statute, New York Penal Law § 70.10 (the "PFO Statute"), under which he was

1

sentenced, is unconstitutional. He also argues that his Sixth Amendment right to effective assistance of counsel was violated because his trial counsel (1) failed to adequately support and renew a motion to suppress evidence seized from him and (2) failed to present expert testimony regarding the reliability of eyewitness identification.

Respondent opposes the petition. He argues that the PFO Statute is constitutional and that petitioner's ineffective-assistance claims are procedurally barred. In the alternative, respondent argues that petitioner's ineffective-assistance claims are meritless.

For the reasons that follow, we recommend that the writ be denied and the petition dismissed.

I. Prior Proceedings

A. Pre-trial Motions

The charges against petitioner stemmed from a robbery of two individuals, David Bearden and Cherlender Manning, which occurred on September 23, 2001 in Highbridge Park. Highbridge Park is

2

located along Edgecombe and St. Nicholas Avenues between 155th and 158th Streets in Manhattan. Three days after the robbery, the police approached Mr. McDowell while he was sitting on a park bench in almost the exact location where the robbery had occurred and wearing clothing that very closely matched the victims' description of the assailant's clothing. After taking him into custody, law enforcement officials placed him in two different five-man line-ups. Ms. Manning identified petitioner as the perpetrator; Mr. Bearden did not.

A New York County grand jury indicted petitioner on two counts of robbery in the third degree. (Pet. ¶ 5; Mem. of Law in Opp'n to the Pet. For a Writ of Habeas Corpus ("Resp't's Mem.") 2). Under New York law, "[a] person is guilty of robbery in the third degree when he forcibly steals property." N.Y. Penal Law § 160.05. Third-degree robbery is a Class D felony, which carries a maximum sentence of seven years. Id., § 70.00(2)(d).

On November 15, 2001, Mr. McDowell's counsel filed a pre-trial Omnibus Motion. (Decl. in Opp'n to the Pet. for a Writ of Habeas Corpus ("Resp't's Decl.") Ex. P, Omnibus Mot. 2). Counsel moved to suppress physical and other evidence, including Mr. McDowell's clothing at the time of arrest and any post-seizure observations,

3

asserting that his client's arrest had been illegal.[1] (Id. at 1-2, Affirmation § VIII(2)). Counsel so moved

> on the grounds that its seizure by the police violated the provisions of the fourth, fifth, and fourteenth amendments to the United States Constitution, and the New York State Constitution, Article I, S.6 and 12 of the New York State Constitution, and the dictates of Mapp v. Ohio, 376 U.S. 643 (1961), and Dunaway v. New York, 442 U.S. 200 (1979).[2]

(See id. at 1-2, Affirmation § VIII(1)). Counsel explained that the prosecutors had notified him that they planned to introduce into evidence petitioner's clothing at the time of his arrest, which "apparently matche[d] a description given by a witness." (Id.). Counsel therefore requested that "all the property that was recovered from [Mr. McDowell's] person, that the people [were] seeking to introduce at trial be suppressed." (Id.). Counsel further argued that

---

[1] In the table of contents of that motion, counsel referred to this argument as a motion for an order "[d]irecting District Attorney's Office to disclose to defense Counsel information concerning eyewitnesses to crimes with which defendant is charged." (Resp't's Decl. Ex. P, Omnibus Mot. 1).

[2] A Mapp hearing allows a defendant to challenge evidence recovered by police as having been obtained as the result of an illegal search and seizure. See Mapp v. Ohio, 367 U.S. 643 (1961). A Dunaway hearing examines whether a defendant's actions justified his arrest. See Dunaway v. New York, 442 U.S. 200 (1979).

4

> [t]he observations and conduct was seized in
> violation of the provisions of the state and
> federal constitution in that it was preceded
> by an unlawful interference with the defendant
> and was performed without his consent and
> without a warrant. Immediately prior to, and
> at the time of the unlawful approach,
> intrusion, and seizure of [petitioner], he was
> sitting in the park talking to acquaintances;
> he was not engaged in any apparent or overt
> criminal conduct.

(Id. at Affirmation § VIII(3)). Accordingly, counsel asserted, "the

evidence should be suppressed." (Id.). Counsel added that if the

District Attorney's opposition "raise[d] a genuine issue of fact

with respect to th[e] motion, a hearing pursuant to CPL S.710.60(4)

[was] requested to resolve any issue so raised." (Id. at

Affirmation § VIII(5)).[3] Neither petitioner nor respondent provides

us with a copy of the prosecution's opposition to petitioner's

Omnibus Motion, if any.


The Honorable Budd Goodman, S.C.J., denied petitioner's motion

to suppress on December 17, 2001. The court found that petitioner

---

[3] If the court were to order a hearing, counsel requested
that the court also order the State to produce at that hearing
"any and all property allegedly seized from the defendant so that
the defendant would have a full and ample opportunity to
effectively cross-examine all witnesses without delay." (Resp't's
Decl. Ex. P, Affirmation § VIII(6) (citing People v. Robinson,
118 A.D.2d 516, 500 N.Y.S.2d 122 (1st Dep't 1986))).

had "fail[ed] to allege sworn allegations of fact in his motion to
contest the factual allegations set forth by the People in the
felony complaint and Voluntary Disclosure Form (which information
was readily available to [petitioner])." (Resp't's Decl. Ex. P,
Pre-Trial Decision and Order Indictment No. 5991/2001 ¶ 4). The
motion failed to respond directly to the felony complaint, which

> state[d] that the defendant [was] alleged to
> have approached the victim, telling her that
> this was a 'stick-up' and that he had a knife
> and a gun in his pocket. The felony complaint
> further allege[d] that af[t]er the victim gave
> the defendant her wallet, that the defendant
> removed the victim's cellular telephone from
> her jeans and then fled with her property.

(Id. (citing cases)). According to Justice Goodman, Mr. McDowell
had "merely state[d] that on September 26, 2001, [three days after
the alleged robbery], that he was sitting on a park bench with
several other individuals when the police approached" and that he
"was not engaged in any overt criminal activity, prior to or during
this time." (Id.). This was the "extent of [petitioner's]
allegations and they [were] merely conclusory in nature." (Id.).
The court also noted that it could deem petitioner's "failure to
address the factual allegations set forth in the felony complaint"
"a concession that render[ed] the holding of a hearing

6

unnecessary." (Id. (citing People v. Mendoza, 82 N.Y.2d 415, 624 N.E.2d 1017 (1993); People v. Toxey, 220 A.D.2d 204, 631 N.Y.S.2d 846 (1st Dep't 1995))). "Accordingly," the court found, "no factual dispute exist[ed] which require[d] the holding of a hearing to resolve." (Id. (citing N.Y. Crim. Proc. Law § 710.60(3)(b))).

 As part of the same omnibus motion, Mr. McDowell also sought a Wade hearing on the basis that the line-ups in which he had participated were unduly suggestive. (Resp't's Decl. Ex. P, Affirmation § V(1)-(2) ("the defendant contends that the fillers used in the lineup did not resemble the defendant in any way" and "that the circumstances under which he was identified were unduly suggestive")). Justice Goodman granted this request, and petitioner's Wade hearing was held on March 15, 2002. (Tr. 1).

 The State's only witness at the Wade hearing was Detective Harold Hernandez of the "Robbery Squad" of the New York City Police Department, 33rd Precinct. (Tr. 8). Detective Hernandez was responsible for arranging petitioner's line-ups, and he described generally the procedures for implementing them. (See generally Tr. 1-43). His partner, Officer Michael Morales,[4] had assisted him by

---

[4] The defense called Officer Morales as its only witness. He testified briefly as to his role in the investigation of the

traveling to Rikers Island to recruit males who resembled petitioner to act as "fillers" in the line-ups. (Tr. 15-17, 64-66). For the first line-up, petitioner chose position four. (Tr. 27). Detective Hernandez explained that he had stretched a blanket across the subjects in the first line-up to allow the viewing witness to focus on the subjects' "face only." (Tr. 28-29). Once the line-up was ready, Detective Hernandez retrieved Ms. Manning for her viewing. He testified that "she walked right over to the glass and said it's number four, I'm a hundred percent it's him" and then left the viewing room. (Tr. 35-37). He also stated that "she wasn't in there no more than five seconds." (Tr. 59). Mr. Bearden viewed a line-up the next day, for which petitioner chose position one. Detective Hernandez testified that Mr. Bearden did not choose Mr. McDowell from the line-up. (Tr. 41-43).

At the close of the <u>Wade</u> hearing, Justice Goodman rejected petitioner's challenge to the line-ups. (Tr. 75-76). He stated that there was not "one scintilla of suggestiveness presented" that would require suppression of the pre-trial line-up identification evidence. (Tr. 75).

---

September 23, 2011 robbery and the subsequent line-ups. (Tr. 63-75).

B. The Trial

    Petitioner's jury trial commenced before Justice Goodman on
March 19, 2002. (Resp't's Mem. 2). At trial, the prosecution called
as witnesses three police officers and both of the robbery victims.
The defense called no witnesses, and the defendant did not testify
on his own behalf. Neither side called an expert witness.


    1. The State's Case


    The prosecution called Police Officers Luke Sullivan and Kevin
Rivera, who had responded to the robbery and later apprehended
petitioner, Detective Hernandez, and the two robbery victims, Mr.
Bearden and Ms. Manning. They testified to the following.


    On September 23, 2011, Mr. Bearden and Ms. Manning met around
5:30 P.M., ate dinner together, and walked to Highbridge Park. (Tr.
361-62). The park is adjacent to Edgecombe Avenue near 155th to 157th
streets in Manhattan. (Tr. 322, 329-32). While there, the former
couple sat on a park bench and discussed their relationship for
about an hour. (Tr. 360, 361-63, 382, 486-87). Mr. Bearden wanted
to resume dating, but Ms. Manning did not. (Tr. 363, 486). It was
an emotional conversation (Tr. 488, 522), and Mr. Bearden testified

9

that the conversation upset him. (Tr. 363). Mr. Bearden cried during the conversation, and he removed his glasses several times to wipe his tears. (Tr. 363-64, 488, 526).

While Mr. Bearden's glasses were off, an individual approached him and Ms. Manning. He had his hands in his pockets and he stated, "I have a gun in one pocket, knife in another. Now how much money do you have on you?" (Tr. 364-65, 387-88, 488, 501-02, 531). The assailant grabbed the cell phone clipped to the belt of Ms. Manning's jeans. (Tr. 366, 488, 502-03, 533). He then directed Mr. Bearden and Ms. Manning to remove the money from their wallets. (Tr. 365, 392). Mr. Bearden told the robber that he had about $10.00 in his wallet. (Tr. 365, 392). The assailant took Mr. Bearden's money, but told him to keep the wallet. (Tr. 489). Mr. Bearden also gave the assailant his watch. (Tr. 366, 393, 489, 536). Ms. Manning then reached into her back pocket for her wallet; while doing so, she slid her rings into her pocket because she did not want the robber to notice them. (Tr. 536-38). She then took out her wallet and showed the assailant that it was empty. (Tr. 489-90, 503). The robber directed Ms. Manning to remove her bracelet (Tr. 365), but he declined to take it after she asked to keep it because her mother had given it to her. (Tr. 491, 503-04). The assailant then told Ms. Manning and Mr. Bearden not to follow him, and left

10

the park heading north. (Tr. 366, 393, 490-91).

Following the robbery, Ms. Manning asked a passerby if she could borrow his cell phone to call 911. (Tr. 369-70, 493, 548). She began to follow the assailant, but then stopped after Mr. Bearden advised her not to follow him. (Tr. 493-95, 549).

Shortly after 7:30 P.M., Officers Sullivan and Rivera received a radio report of the robbery. (Tr. 324, 404). They responded within three to six minutes after they were called. (Tr. 394, 495-96, 550-53). The officers met Mr. Bearden, Ms. Manning, and two other officers at 157th Street and St. Nicholas Avenue. (Tr. 324, 371, 407). It was dark by the time that they arrived. (Tr. 344-45).

Mr. Bearden and Ms. Manning both provided the police with a description of the assailant (Tr. 395), although Ms. Manning gave the police a "more complete description" of him. (Tr. 394, 411, 433). Mr. Bearden did not inform police that he "didn't get a good look at the perpetrator." (Tr. 396).

The officers and the victims then conducted a canvass in the nearby vicinity to attempt to find the assailant. (Tr. 326, 371, 496). They were looking for an individual who fit the following

11

description: a black male, about 5'8" tall, weighing about 170 pounds, wearing a white baseball cap, beige slacks, and a checkered beige shirt. (Tr. 326, 408-09). Although the car slowed to allow the victims to get a better look at four or five individuals who "partial[ly] matche[d]" the victims' description (Tr. 327, 347-48, 410, 420, 510), neither Ms. Manning nor Mr. Bearden saw anyone whom they recognized as the robber. (Tr. 496, 510). The canvass lasted about fifteen or twenty minutes. (Tr. 349, 420, 511, 554). Following the canvass, the police brought the victims to the 33rd Precinct, where they were formally interviewed by Detective Hernandez. (Tr. 328, 348, 371, 411, 433-34, 467-68, 511-12, 554-55). The victims provided him with descriptions of the assailant. (Tr. 371-72, 432-34, 467-68, 511-12, 554-55). Mr. Bearden and Ms. Manning then returned home. (Tr. 372, 512-13).

Three days later, September 26, 2001, at around 7:15 P.M., Officers Sullivan and Rivera, the same officers who had responded to the robbery, were patrolling around Edgecombe Park, near the scene of the crime. (Tr. 333-34, 327). From their police vehicle, they noticed Mr. McDowell and another individual sitting on a park bench at 155th Street and Edgecombe Avenue. (Tr. 334, 349-50, 415). At that time, it was getting dark but the officers "could see," and "the lights from the park weren't on yet." (Tr. 421). Petitioner

12

was wearing a white Yankees baseball cap, a checkered beige and white shirt, and beige or khaki pants. (Tr. 334, 415-16, 423, 501). His shirt was baggy and untucked. (Tr. 418). It was petitioner's clothing that caused Officer Sullivan to notice him. (Tr. 337, 351-52).

The officers left their vehicle, approached petitioner, and engaged him in a short conversation. (Tr. 335, 416). Petitioner did not attempt to flee at any point during their interaction. (Tr. 352, 422). The police then searched Mr. McDowell, who did not possess any of the property that had been stolen from Ms. Manning and Mr. Bearden. (Tr. 422). The officers brought petitioner back to the 33rd Precinct, where they searched him again. (Tr. 335, 416, 475). The officers again found nothing related to the robbery. (Tr. 475). Around 9:00 P.M., Detective Hernandez formally arrested petitioner and placed him in a holding cell. (Tr. 462).

That night, Detective Hernandez assembled a five-person line-up that included petitioner. (Tr. 435-38, 446-47). Once the line-up was ready, he called Ms. Manning and asked her to come in and view the line-up. (Tr. 438, 469). Another officer picked up Ms. Manning and her grandmother and brought them to the 33rd Precinct. (Tr. 445).

Before Ms. Manning viewed the line-up, Detective Hernandez stretched a blanket across the row of subjects to cover their clothing so that only their faces were visible. (Tr. 448). Prior to the viewing, Detective Hernandez told Ms. Manning not to be afraid, and informed her that the line-up participants were unable to see her. (Tr. 455, 515-16). He also told her not to worry if she did not recognize anyone from the line-up. (Tr. 515). Ms. Manning viewed the line-up around 11:30 P.M., and identified petitioner, subject number four, in less than twenty seconds. (Tr. 435, 517). At some point following the line-up, Ms. Manning told Mr. Bearden that she "had no problem identifying the guy." (Tr. 558). Following the line-up, Detective Hernandez seized petitioner's clothing. (Tr. 457).

The next night, Mr. Bearden viewed a five-person line-up that also included petitioner. (Tr. 459, 461). After examining the line-up for "about a minute," Mr. Bearden identified someone other than petitioner as the robber. (Tr. 377-78, 398, 462). Mr. Bearden testified that he "could not make a clear identification" of the assailant, and that he had chosen the man who he "thought best resembled" that person. (Tr. 373). At the time, Mr. Bearden was "not certain" that the man whom he had chosen was the robber -- he testified that he was only twenty percent sure of his

14

identification. (Tr. 379). Mr. Bearden also testified that because
Ms. Manning had identified someone, he felt that he should identify
someone as well. (Tr. 379-80).

As for the reliability of the victims' identification of Mr.
McDowell (or, in Mr. Bearden's case, his failure to do so), their
testimony on direct and cross examination explored that question in
some depth.

Although the sun was setting at the time of the robbery (Tr.
498-99, 545), there was conflicting testimony as to whether the
streetlights had been turned on. Mr. Bearden testified that they
had (Tr. 368), while Ms. Manning testified that they had not
because "[i]t wasn't dark," although it was "getting dark." (Tr.
498-99, 545).

Mr. Bearden and Ms. Manning both have problems with their
vision. Mr. Bearden is nearsighted without his glasses (Tr. 359),
and his vision begins to get blurry about a foot or so away from
his face when he is not wearing them. (Tr. 360, 391). Mr. Bearden
testified that he was not wearing his glasses during the robbery
(Tr. 386, 391), and that the assailant was an estimated two to
three feet away from him during the robbery. (Tr. 360, 363-64, 367,

15

386, 391). At trial, Mr. Bearden described the assailant as a black
male with a "medium to dark" complexion, a "partial beard" with
some "hair down the side of his cheek" and a "stocky" build. (Tr.
368-69). He estimated the assailant's height as shorter than he (at
6'2"), though he stated that the assailant was "not a short man."
(Tr. 367). He also described the assailant as wearing a white
baseball cap, khaki pants, and a "pullover" top. (Tr. 367-68). Mr.
Bearden did not identify petitioner at trial.

Ms. Manning is also nearsighted, but was wearing her contact
lenses at the time of the incident. (Tr. 485). When wearing her
lenses, her vision is "almost 20/20." (Tr. 485). Ms. Manning
testified that she looked "right at" the assailant when he stood in
front of her and Mr. Bearden, and that she looked him "in the eye"
several times during the robbery. (Tr. 501, 543). Ms. Manning
described the assailant as a black man with dark skin, who wore a
white baseball cap, khaki pants, and an untucked tan plaid shirt
that overlapped his pants, covering their front. (Tr. 501-02, 508-
09). She further testified that some of the assailant's hair was
"sticking out of the sides" of his baseball cap, and that he was of
medium build -- "neither skinny nor heavy." (Tr. 509). She
estimated the assailant's height at 5'8", because she thought that
he was taller than she but shorter than Mr. Bearden, who she

16

believed was six feet tall. (Tr. 508-09). She also described the assailant as having facial hair "like a beard, mustache." (Tr. 509). At trial, Ms. Manning identified petitioner as the robber. (Tr. 494-95).

When shown the shirt that petitioner was wearing at the time of his arrest, Ms. Manning confirmed that it was "the type of shirt" that was worn during the crime. (Tr. 506-07). She also identified petitioner's pants at the time of arrest as "the khaki pants that he was wearing when he robbed [her], and the same khaki pants that [she] described in the phone call to the police in the police report." (Tr. 507). When shown the white Yankees cap that petitioner was wearing at the time of his arrest, Ms. Manning stated that she "remember[ed] the white baseball cap," but "not necessarily the Yankees emblem on the cap." (Tr. 505). If the Yankees emblem was on petitioner's cap during the robbery, she "didn't notice it." (Tr. 506). The Robbery Complaint Worksheet that Detective Hernandez completed following his initial interview of the robbery victims indicated that the perpetrator was wearing a cap, but did not indicate that there was any lettering or identifying marks on the hat, or that it was a Yankees cap. (Tr. 474-75).

17

The Complaint Report provided a general description of the perpetrator and a narrative of the crime. (Tr. 422). The final typed version of the report stated that the victims had described the perpetrator's shirt as a "tank top" or a "t-shirt." (Tr. 427). However, Officer Rivera testified that another individual had typed the final version of complaint report from his handwritten notes, and that any description in the report of the perpetrator's shirt as a tank top or t-shirt was a transcription error, and not a detail that Ms. Manning or Mr. Bearden had provided. (Tr. 427-28). Ms. Manning testified that she could not recall if she "ever describe[d] the defendant's shirt to the police as a tank top or t-shirt." (Tr. 509).

At trial, Officers Sullivan and Rivera both identified petitioner as the man whom they had apprehended in the park on September 26, 2001. (Tr. 334-35, 415-16).

### 2. The Defense Case

Mr. McDowell did not call any witnesses at trial. Defense counsel relied on cross-examination of the prosecution witnesses and a pointed summation to present his theory of the case. In his summation, defense counsel offered an extended argument to the

18

effect that the identifications of petitioner were so unreliable as to cause reasonable doubt that he was the assailant. (See generally Tr. 570-99).

C. Verdict and Sentencing

On March 26, 2002, the jury convicted petitioner on both counts of third-degree robbery. (Pet. ¶ 6). In July 2002, the District Attorney moved to have petitioner adjudicated as a discretionary persistent offender under the PFO Statute, New York Penal Law § 70.10, and New York Criminal Procedure Law § 400.20. (See Pet. Ex. C).

On July 8, 2002, petitioner appeared for sentencing. (Pet. ¶ 7, Ex. B). The court first addressed the question of whether he should be sentenced as a persistent felony offender. (Pet. Ex. B, at 2-3). A persistent felony offender is "a person who stands convicted of a felony after having previously been convicted of two or more [qualifying] felonies." New York Penal Law § 70.10(1)(a). If the court finds "that a person is a persistent felony offender, and when it is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will

19

best serve the public interest," then the court "may impose the sentence of imprisonment authorized by that section for a class A-I felony." Id. § 70.10(2).

The prosecution showed that petitioner had previously been convicted of two counts of first-degree manslaughter in 1982 and one count of first-degree criminal contempt in 1999, thus demonstrating that he met the definition of a persistent felony offender under New York Penal Law § 70.10(1). (Pet. Ex. B, at 4-7). To justify imposing an enhanced sentence under New York Penal Law § 70.10(2), the prosecution submitted a memorandum of law explaining the circumstances of petitioner's manslaughter convictions and his struggles with alcohol in the early 1990's. (Pet. Ex. B, at 16).

The sentencing court found that the prosecution had met its burden of showing beyond a reasonable doubt that petitioner was eligible for sentencing as a discretionary persistent felon. (Id. at 32). The court determined that petitioner did not "deserve any consideration," and that the robbery was "another vicious crime where [he] held up two people [that showed] he still [had] to become a useful citizen." (Id. at 33). The court further found that petitioner's life history and childhood trauma did not "excuse

20

[his] behavior." (<u>Id.</u>). The court therefore sentenced petitioner to two concurrent, enhanced prison terms of fifteen years to life. (<u>Id.</u>).

D. <u>Post-Trial Motion Practice and Appeals</u>

On September 3, 2004, Mr. McDowell filed a motion to set aside his sentence pursuant to New York Criminal Procedure Law § 440.20. He argued that his sentence under New York's PFO Statute violated his Sixth and Fourteenth Amendment rights to a trial by jury as expounded in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), and <u>Blakely v. Washington</u>, 542 U.S. 296 (2004). (Pet. ¶ 10a).[5] The court denied that motion on July 14, 2005. (<u>See</u> Pet. Ex. E). The court noted that the New York Court of Appeals ("Court of Appeals") had upheld the validity of the persistent-felony-offender sentencing procedure, and it therefore held that petitioner's sentence should not be disturbed. (<u>See</u> Resp't's Decl. Ex. A). Petitioner sought leave to appeal from that decision, but on August 31, 2005 the First Department denied his

---

[5] New York Criminal Procedure Law § 440.20 states in pertinent part that "[a]t any time after the entry of a judgment, the court in which the judgment was entered may, upon motion of the defendant, set aside the sentence upon the ground that it was unauthorized, illegally imposed or otherwise invalid as a matter of law."

21

application. (See Pet. ¶¶ 10a-b, Ex. F).

On December 30, 2005, petitioner filed a direct appeal from his conviction. (Id. ¶ 10c, Ex. G, at 1-29; Resp't's Decl. 8). He argued (1) that the trial court had erred in denying his motion to suppress physical evidence without a hearing because he had set forth a sufficient basis to warrant such a hearing, especially in light of the lack of information available to trial counsel at the time he made the motion; (2) that the trial court had erred in its identification jury charge by encouraging the jury to consider Ms. Manning's positive identification of petitioner without mentioning Mr. Bearden's failure to identify him, thereby bolstering the prosecution's case; and (3) that his sentence was harsh and excessive, and should be reduced in the interest of justice and in light of the prosecution's pre-trial offer of a two- to four-year prison term in exchange for a guilty plea. (See Pet. Ex. G, at i). The State responded (1) that petitioner's guilt had been proved beyond a reasonable doubt; (2) that the trial court had properly denied his suppression motion without a hearing; (3) that petitioner's challenge to the court's identification charge was unpreserved and meritless; and (4) that his sentence reflected a proper exercise of the trial court's discretion. (See Pet. Ex. G, Br. for Resp't; Resp't's Decl. Ex. D).

22

The First Department unanimously affirmed petitioner's conviction on June 1, 2006. See People v. McDowell, 30 A.D.3d 160, 815 N.Y.S.2d 570 (1st Dep't 2006). The panel held that the trial court had properly denied the suppression motion without a hearing because the allegations in Mr. McDowell's motion papers, considered in the context of the criminal complaint and the voluntary disclosure form, failed to raise a factual dispute that required a hearing. Id. at 160, 815 N.Y.S.2d at 570. The court explained that the complaint and the voluntary disclosure form had specified that petitioner's arrest was based on a robbery that had occurred three days earlier. Therefore, the court found that petitioner's "general denial of criminal activity 'prior to' his arrest, which did not address the People's specific allegations, was insufficient to warrant a hearing." Id. For example, instead of raising any issues regarding the sufficiency of the description upon which he had been arrested, the motion papers had merely stated that the clothing recovered from him at the time of arrest "apparently" matched the description that a witness had provided. Id. The appellate court also determined that the sentencing court had properly exercised its discretion in sentencing Mr. McDowell as a persistent felony offender. Id. Finally, the First Department found that his challenge to the trial court's identification jury charge was unpreserved, and it declined to review the claim in the interest of

23

justice. Id. Alternatively, the court noted that if it had reviewed the claim, it would have concluded that the challenge was meritless. Id. Mr. McDowell moved for leave to appeal to the New York Court of Appeals, but that court denied the application on September 15, 2006. People v. McDowell, 7 N.Y.3d 850, 823 N.Y.S.2d 779 (2006).

On November 7, 2007, petitioner filed a pro se motion, under New York Criminal Procedure Law § 440.10(1)(h), to vacate the judgment based on claims of ineffective assistance of counsel. (Pet. ¶¶ 10f, 13; Resp't's Decl. Ex. K). Mr. McDowell complained that his trial counsel had failed (1) to object to Ms. Manning's in-court identification of him; (2) to request that the court "re-open" the Wade hearing based on "newly discovered factual evidence," specifically that Detective Hernandez had made a suggestive statement during the line-up; (3) to object to the court's charge on identification; (4) to call an expert witness to challenge the identification testimony and/or present evidence of prior misidentification and mistaken identification to inform jurors of the "uncertainty" and "inaccuracy" of eyewitness testimony; (5) to introduce into evidence the police complaint report in support of his suppression arguments at the Wade hearing; and (6) to offer, in support of his suppression motion, a sworn

24

factual statement that was sufficient, pursuant to New York
Criminal Procedure Law §§ 710.60(1), (3), to trigger a hearing.
(Resp't's Decl. Ex. K, Mot. for the Def. i).


The trial court, by the Hon. Eduardo Pardó, S.C.J., denied
petitioner's motion in July 2009. (Pet. ¶¶ 10g-h; see generally
Resp't's Decl. Ex. L). The court first found that all of
petitioner's claims were procedurally barred pursuant to New York
Criminal Procedure Law § 440.10(2), because "sufficient facts
appeared on the record to have permitted appellate review of each
claim" on direct appeal. (Resp't's Decl. Ex. L, at 3-5). With
respect to the adequacy of the suppression motion, the court noted
that the First Department had reviewed counsel's original motion to
suppress and affirmed that "the allegations in his motion papers .
. . failed to raise a factual dispute requiring a hearing." (Id.).
Therefore, the court concluded, "defendant was clearly in a
position, on the same appeal, to allege that counsel was
ineffective for failing to draft sufficient pleadings, but did not
do so." (Id. at 2, 11). With respect to counsel's failure to call
an expert, the court noted that "the trial record reveals that
defense counsel did not seek to present such expert testimony," and
it held that the issue should therefore also have been raised on
Mr. McDowell's direct appeal. (Id. at 4).

25

In the alternative, the court found that even if petitioner's claims were not procedurally barred, they were meritless. (See id. at 5-13). In so holding, the court applied the New York ineffective-assistance standard since it was more protective of criminal defendants. (Id. at 5-9).

In addressing Mr. McDowell's complaint about his attorney's failure to call an expert on identification, the court first noted that the governing law on the admission of such testimony at the time of trial was People v. Lee, 96 N.Y.2d 157, 726 N.Y.S.2d 361 (2001), which had held that although expert testimony regarding the reliability of eyewitness identifications was potentially admissible, "[i]t [was] for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefitted by the specialized knowledge of an expert." (Resp't's Decl. Ex. L, at 11 (quoting id. at 162, 726 N.Y.S.2d at 364 (quoting People v. Cronin, 60 N.Y.2d 430, 433, 458 N.E.2d 351, 352 (1983)))). Thus, the court in Lee had left the "ultimate question of the admissibility and limits of such testimony to the 'sound discretion of the trial court.'" (Id. (quoting Lee, 96 N.Y.2d at 162, 726 N.Y.S.2d at 364)).

26

Applying <u>Lee</u> to petitioner's claim, the court first mentioned the strength of the evidence against petitioner. The court noted that he had been "found only three days later, in the same park where the robbery occurred, wearing very similar clothing to that described by witnesses at the time of the actual incident, and fitting the same general height, weight and race description." (Resp't's Decl. Ex. L, at 11). Under those circumstances, and given the state of the law at the time of trial, the court was "not persuaded that the trial court would have granted an application to introduce expert eyewitness testimony." (<u>Id.</u> at 11-12). The court added that in a similar case, <u>People v. Logan</u>, 58 A.D.3d 439, 870 N.Y.S.2d 320 (1st Dep't 2009), the court had found that defendant's claim of ineffective assistance based on trial counsel's failure to call an expert at trial to address identification "discrepancies" was "unpersuasive" without a showing that either the "'complained-of choices by counsel [were] unreasonable, or that they caused him any prejudice or deprived him of a fair trial.'" (Resp't's Decl. Ex. L, at 12 (alteration in original) (quoting <u>Logan</u>, 58 A.D.3d at 440, 870 N.Y.S.2d at 322)). The <u>Logan</u> court had also noted that "'it could not be assumed that the trial court would have permitted [such an] expert to testify.'" (<u>Id.</u> (alteration in original) (quoting same)). Justice Pardó therefore found that trial counsel was "not ineffective for failing to introduce such expert

27

testimony" because petitioner had "not demonstrated that counsel's failure to call such expert was unreasonable, given the state of the law at the time, or that expert testimony was likely to be admitted at trial." (Id.).

As for the inadequacy of the motion to suppress, the court first noted that counsel had moved to suppress, and in that motion he had "alleged facts in support of his claim that the defendant was unlawfully seized." (Id.). The court then noted that on appeal, petitioner "did not argue that trial counsel's submissions constituted ineffective assistance," but that his "sole argument was that the lower court had erred in denying the motion." (Id.). The First Department had affirmed the lower court's ruling denying the suppression motion. The section 440.10 court therefore reasoned that, "[h]aving received a denial by the appellate court" petitioner was "now [seeking] to argue that the trial attorney's motion was proof of ineffective assistance." (Resp't's Decl. Ex. L, at 12). The court was "not persuaded." (Id.). The court explained that even assuming for the sake of argument that "counsel did fail [petitioner] in this regard, an error by counsel [was] but one factor to consider" because, to prevail on an ineffective-assistance claim under New York law, petitioner had to demonstrate that he was "'deprived of a fair [process] by less than meaningful

28

representation.'" (<u>Id.</u> at 13 (quoting <u>People v. Benevento</u>, 91
N.Y.2d 708, 713, 674 N.Y.S.2d 629, 632 (1998))). The court
concluded that "defense counsel's possible failure, to draft
legally sufficient pleadings on the issue of probable cause, [did
not] prejudice[] the defendant to such a degree, that the 'fairness
of the proceedings as a whole' w[as] undermined by counsel's
error." (<u>Id.</u>).

Based on this reasoning, the court concluded that petitioner
had not shown denial of effective assistance of counsel under
either New York's "meaningful representation" standard or the
federal <u>Strickland</u> standard. It therefore denied petitioner's
motion. (<u>Id.</u>).

Petitioner moved for leave to appeal the denial of his motion
to vacate. (<u>See</u> Resp't's Decl. Ex. M). The First Department denied
that application in August 2009. (<u>See</u> <u>id.</u> Ex. O).

II. <u>The Current Habeas Petition</u>

Petitioner finally turned to this court, filing his habeas
corpus petition on September 11, 2009. In view of his challenge to
New York's PFO Statute, we held our decision in abeyance pending

29

the outcome of certiorari petitions in <u>Portalatin v. Graham</u>, 624 F.3d 69 (2d Cir. 2010), and <u>People v. Battles</u>, 16 N.Y.3d 54, 917 N.Y.S.2d 601 (2010), both of which cases addressed that issue. Both certiorari petitions have since been denied. <u>See</u> <u>Portalatin v. Graham</u>, 131 S. Ct. 1693 (2011); <u>Battles v. New York</u>, 132 S. Ct. 123 (2011).

ANALYSIS

I. <u>Habeas Standard of Review</u>

The stringency of federal habeas review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, then the petitioner may obtain relief only if the state court's ruling "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

30

States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002). "If the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed de novo.'" Dolphy v. Mantello, 552 F.3d 236, 238 (2d Cir. 2009) (quoting Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006)).


"[C]learly established" federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

31

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "A federal court may not grant habeas simply because, in its independent judgment, the 'relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. The Second Circuit has interpreted this language to mean that while "[s]ome increment of incorrectness is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).

The Supreme Court's most recent decision on this issue reflects a seemingly narrower view of what constitutes an "unreasonable" application of federal law. It states that "[a] state court's determination that a claim lacks merit precludes

32

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported, or could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an "unreasonable" application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

As for the state court's factual findings, under the habeas statute "a determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the

33

burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S. v. Carpinello, 589 F.3d 75, 80-81 (2d Cir. 2009); McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).


II. The Sentencing Claim


Petitioner asserts that New York's PFO Statute violates the Sixth and Fourteenth Amendments to the United States Constitution by allowing a judge to sentence a defendant to a term longer than the statutory maximum that could be imposed based solely on facts reflected in the jury verdict or admitted by defendant prior to or during trial. (Mem. of Law in Supp. of Pet. for Writ of Habeas Corpus by a Person in State Custody ("Pet'r's Mem.") 10). To support this proposition, petitioner cites Apprendi v. New Jersey, 530 U.S. 466 (2000), Ring v. Arizona, 536 U.S. 584 (2002), and Blakely v. Washington, 542 U.S. 296 (2004). (Pet'r's Mem. 11-12). These held, in the words of Apprendi, that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for crime beyond the prescribed statutory maximum must be submitted to jury, and proved beyond reasonable doubt." 530 U.S. at 490.


34

New York has two statutory provisions that relate to the sentencing of persistent felony offenders: the PFO Statute, New York Penal Law § 70.10, and the persistent violent felony offender statute, New York Penal Law § 70.08. McGraw v. Lee, 2011 WL 1682633, at *6 (S.D.N.Y. Apr. 27, 2011). The PFO Statute defines a persistent felony offender as someone "who stands convicted of a felony after having previously been convicted of two or more felonies . . . ." N.Y. Penal Law § 70.10(1)(a).[6] If a defendant satisfies the definition of a persistent felony offender under § 70.10(1), then the court may impose any sentence authorized for a "class A-I" felony as long as the court also finds "that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest . . . ." N.Y. Penal Law § 70.10(2).

When Mr. McDowell filed his habeas petition, the constitutionality of the PFO Statute was still an open question in this Circuit. See, e.g., Ortiz v. Artus, 2011 WL 5447900, at *2 (S.D.N.Y. Nov. 8, 2011); McGraw, 2011 WL 1682633, at *6 (comparing, e.g., Washington v. Poole, 507 F. Supp.2d 342, 358-59 (S.D.N.Y.

---

[6] The statute outlines what prior felony convictions qualify. N.Y. Penal Law § 70.10(1)(b), (c).

35

2007), with West v. Breslin, 2008 WL 110947, at *8 (S.D.N.Y. Jan. 2, 2008)). At one point thereafter, the Second Circuit held the PFO statutory scheme unconstitutional, concluding that, notwithstanding the New York Court of Appeals' purportedly Apprendi-compliant interpretation of the PFO Statute and its rejection of the same constitutional challenge, Apprendi and related decisions compelled invalidation of the statute. See Besser v. Walsh, 601 F.3d 163, 178-89 (2d Cir. 2010)). Later in 2010, however, the Circuit vacated Besser and upheld the constitutionality of New York's PFO Statute. Portalatin v. Graham, 624 F.3d 69 (2d Cir. 2010) (en banc). In doing so, the Second Circuit relied on the New York Court of Appeals holding that a sentencing court's inquiry under § 70.10(2) of the PFO Statute is merely procedural, Portalatin, 624 F.3d at 89–90, and that the PFO Statute authorizes a class A-I sentence based solely on the defendant's criminal history. Portalatin, 624 F.3d at 84, 88-94. The Supreme Court subsequently denied a certiorari petition from this Circuit's holding in Portalatin, 131 S. Ct. at 1693, and later denied review of a more recent New York Court of Appeals decision reiterating its reading of the PFO Statute. Battles v. New York, 132 S. Ct. at 123.

Because Portalatin controls, Mr. McDowell's sentencing claim must be rejected.

36

III. The Ineffective-Assistance Claims

Petitioner asserts that his trial counsel was ineffective for two reasons: (1) because he failed to adequately support, and renew, a pre-trial motion to suppress physical and other evidence and (2) because he failed to call an expert witness at trial to testify about the various shortcomings of eyewitness identification. These complaints echo some of the arguments that Mr. McDowell presented on his section 440.10 motion.

Respondent notes that the section 440.10 court rejected both of these claims based on the procedural requirement that the defendant raise on direct appeal any grounds that relied on matters found in the trial-court record. On that basis he contends that Mr. McDowell's Sixth Amendment claims are procedurally barred from review here. Alternatively, he asserts that they are meritless.

We conclude that petitioner's argument regarding the purported inadequacy of the suppression motion is procedurally barred, but that his claim premised on the failure to call an expert witness is not barred. That said, we further conclude that petitioner fails to sustain any aspect of his Sixth Amendment claims on the merits.

37

A. Procedural Bar

1. Standards

i. Independence and Adequacy

If the highest state court to address a federal-law claim disposed of it on a "state law ground that is independent of the federal question and adequate to support the judgment," a petitioner may not obtain habeas review unless he demonstrates both cause for his default and prejudice or else establishes that a failure to address the claim would constitute a fundamental miscarriage of justice. E.g., Coleman v. Thompson, 501 U.S. 722, 729 (1991); Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) (quoting Harris v. Reed, 489 U.S. 255, 260 (1989)). If the state court rejects a claim as unpreserved and then, in the alternative, notes that it would have rejected the claim on its merits if it had considered it, then the ruling is still considered to rest on procedural grounds. See, e.g., Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (state court's "contingent observation" is not an "adjudication on the merits" for purposes of habeas review); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

38

To be independent, the state court's holding must rest on state law that is not "interwoven with the federal law." <u>Jimenez</u>, 458 F.3d at 137 (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983)). Since it can be "'difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference,' . . . reliance on state law must be 'clear from the face of the opinion.'" <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000) (quoting <u>Coleman</u>, 501 U.S. at 732, 735). When determining whether we may entertain a claim, we "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" <u>Galarza v. Keane</u>, 252 F.3d 630, 637 (2d Cir. 2001) (quoting <u>Jones v. Stinson</u>, 229 F.3d 112, 118 (2d Cir. 2000)).

As for adequacy, the state procedural requirement must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." <u>Murden v. Artuz</u>, 497 F.3d 178, 192 (2d Cir. 2007) (quoting <u>Monroe v. Kuhlman</u>, 433 F.3d 236, 241 (2d Cir. 2006)); <u>see</u> <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002); <u>Cotto v. Herbert</u>, 331 F.3d 217, 239 (2d Cir. 2003) (quoting <u>Garcia v. Lewis</u>, 188 F.3d 71, 77 (2d Cir. 1999)). However, even "[s]tate rules that are firmly

39

established and regularly followed will not foreclose review of a
federal claim where the particular application of the rule is
'exorbitant.'" <u>Brown v. Lee</u>, 2011 WL 3837123, at *5 (S.D.N.Y. Aug.
30 2011) (quoting <u>Kemna</u>, 534 U.S. at 376). In assessing adequacy,
the Second Circuit has adopted from <u>Kemna</u> three general
considerations as pertinent to the analysis. These are:

> (1) whether the alleged procedural violation
> was actually relied on in the trial court, and
> whether perfect compliance with the state rule
> would have changed the . . . court's decision;
> (2) whether state caselaw indicated that
> compliance with the rule was demanded in the
> specific circumstances presented; and (3)
> whether petitioner had "substantially
> complied" with the rule given "the realities
> of trial," and, therefore, whether demanding
> perfect compliance with the rule would serve a
> legitimate governmental interest.

<u>Murden</u>, 497 F.3d at 192 (quoting <u>Cotto</u>, 331 F.3d at 240). In making
this determination, the federal court owes deference to the state
courts, and should find a state procedural-default ruling adequate
as long as it has "a fair or substantial basis in state law."
<u>Garcia</u>, 188 F.3d at 78 (citing, <u>inter alia</u>, <u>Arce v. Smith</u>, 889 F.2d
1271, 1273 (2d Cir. 1989)). It bears emphasis that "[b]ecause of
comity concerns, a decision that a state procedural rule is
inadequate should not be made 'lightly or without clear support in

40

state law.'" Murden, 497 F.3d at 192 (quoting Garcia, 188 F.3d at 77).

### ii. Procedural Bar Exceptions: Cause and Prejudice and Fundamental Miscarriage of Justice

A petitioner may obtain habeas review of his otherwise procedurally barred claims only if he demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law, or else shows that failure by the habeas court to consider the claims would result in a fundamental miscarriage of justice. See, e.g., Coleman, 501 U.S. at 749–50; Jimenez, 458 F.3d at 138. The Supreme Court has defined "cause" to mean an "objective factor external to the defense" that impeded the defendant's efforts to comply with the state procedural rules. Murray v. Carrier, 477 U.S. 478, 488 (1986); Strickler v. Greene, 527 U.S. 263, 283 n.24 (1999) (quoting Murray, 477 U.S. at 488). Cause may be demonstrated by "a showing that the factual or legal basis for a claim was not reasonably available to counsel," that "interference by officials made compliance impracticable," or that "the procedural default is the result of ineffective assistance of counsel." Murray, 477 U.S. at 488 (internal citations omitted); see, e.g., Restrepo v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999);

41

<u>Bossett v. Walker</u>, 41 F.3d 825, 829 (2d Cir. 1994). It bears mention, however, that a petitioner cannot invoke a Sixth Amendment ineffective-assistance claim as cause unless he has asserted such an argument as an independent claim in state court and exhausted his state-court remedies as to that claim; a defaulted Sixth Amendment claim cannot serve as cause for overcoming a procedural bar. <u>See</u>, <u>e.g.</u>, <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451-53 (2000).

Even if a habeas petitioner can establish cause, he must also show that he suffered actual prejudice. <u>See</u> <u>Coleman</u>, 501 U.S. at 750. To demonstrate prejudice, the petitioner must show "not merely that the errors at his trial created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982) (emphasis in original); <u>see</u>, <u>e.g.</u>, <u>Rodriguez v. Mitchell</u>, 252 F.3d 191, 203-04 (2d Cir. 2001); <u>Holland v. Scully</u>, 797 F.2d 57, 69 (2d Cir. 1986).

The only other exception to the procedural-bar rule applies if the petitioner demonstrates that the habeas court's refusal to consider the merits of his procedurally barred claim would result in a "fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at

42

750. This "rare" exception is reserved for the "extraordinary case[] where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." Schlup v. Delo, 513 U.S. 298, 321 (1995) (quoting Murray, 477 U.S. at 496); see also Doe v. Menefee, 391 F.3d 147, 160-61 (2d Cir. 2004). Moreover, the petitioner is expected to establish actual innocence based on new evidence rather than what was presented at trial. See, e.g., Schlup, 513 U.S. at 327, 329.

### 2. Assessing Respondent's Procedural-Bar Argument: The Suppression Motion

It is well-established that a state court's decision not to review a claim in a motion to vacate under § 440.10(2) may suffice as an independent and adequate state-law procedural ground barring habeas review. See, e.g., Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995); Chatmon v. Mance, 2011 WL 5023243, at *9 (S.D.N.Y. Oct. 20, 2011) (citing, inter alia, Sweet, 353 F.3d at 141; Taylor v. Poole, 2009 WL 2634724, *16 (S.D.N.Y. Aug. 27, 2009)); Chambers v. Conway, 2011 WL 2226956, at *6 (S.D.N.Y. June 8, 2011); Edmonds v. Purdy, 2009 WL 1357953, at *3 (S.D.N.Y. May 14, 2009); Jones v. Donnelly, 487 F. Supp.2d 403, 411 (S.D.N.Y. 2007). However, we must examine whether the court's reliance on §

43

440.10(2) was independent and adequate in the specific circumstances of this case. Murden, 497 F.3d at 192.

### i. Independence

There can be no question that the section 440.10 court's decision not to review petitioner's ineffective-assistance claim based on the purported inadequacy of the suppression motion constituted an independent state-law ground. The court relied solely on New York Criminal Procedure Law § 440.10(2) in making that decision: "The factual underpinnings of the defendant's ineffective assistance claim are all on the record . . . [and] this court is not persuaded that any valid reasons exist for the defendant's failure to raise any of these issues on direct appeal. Accordingly, the defendant's motion is denied in its entirety." (See Resp't's Decl. Ex. L, at 5 (citing N.Y. Crim. Proc. Law § 440.10(2))); accord Johnson v. Sabourin, 2005 WL 2663039, at *3 (S.D.N.Y. Oct. 14, 2005) (citing Besser, 2003 WL 22801952, at *10 (S.D.N.Y. Nov. 26, 2003) (citing Stewart v. Smith, 536 U.S. 856, 859-60 (2002)))).[7]

_____

[7] The First Department's denial of leave to appeal, citing no law, does not change this result. Johnson, 2005 WL 2663039, at *3 (citing Pearson v. Greiner, 2004 WL 2453929, at *8 (S.D.N.Y. Nov. 3, 2004)).

44

ii. <u>Adequacy</u>

Respondent argues that § 440.10(2) was an adequate state-law ground to deny petitioner's motion to vacate. (Resp't's Mem. 38-41). Insofar as Mr. McDowell's motion was premised on the purported inadequacy of the suppression motion, we agree.

The New York Court of Appeals has cautioned that "[g]enerally, the ineffectiveness of counsel is not demonstrable on the main record" so "in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or postconviction proceeding brought under CPL 440.10." <u>People v. Brown</u>, 45 N.Y.2d 852, 853-54, 382 N.E.2d 1149, 1149-50 (1978); <u>see also</u> <u>People v. Harris</u>, 109 A.D.2d 351, 360, 491 N.Y.S.2d 678, 687 (2d Dep't 1985) (citing cases) (stating that "[t]he Court of Appeals has time and time again advised that ineffective assistance of counsel is generally not demonstrable on the main record"). "'Where the ineffective assistance of counsel claim is not record-based, federal habeas courts have held that the rule of CPL § 440.10(2)(c) is not adequate' to bar habeas review." <u>McCollough v. Bennett</u>, 2010 WL 114253, at *6 (E.D.N.Y. Jan. 12, 2010) (quoting <u>Byron v. Ercole</u>, 2008 WL 2795898, at *13 (E.D.N.Y. July 18, 2008)).

45

Nonetheless, there are circumstances in which the claimed errors of counsel may be adequately assessed from the record before the trial court, and in such cases, the defendant may be required to pursue such claims on his direct appeal. E.g., People v. Moore, 66 A.D.3d 707, 710-12, 886 N.Y.S.2d 468, 471-73 (2d Dep't 2009); People v. Nusbaum, 222 A.D.2d 723, 634 N.Y.S.2d 852 (3d Dep't 1995) (citing People v. English, 215 A.D.2d 871, 873, 627 N.Y.S.2d 105, 107 (3d Dep't 1995)).

Given these New York standards, we agree that the trial court's procedural rejection of Mr. McDowell's complaint about the suppression motion was adequate. The purported weakness of that suppression motion, which failed to trigger a hearing, was apparent on its face. Moreover, the full record of the trial testimony was adequate to permit a reviewing court to determine whether defense counsel had had a compelling basis to pursue a more pointed, and potentially meritorious, suppression motion. Hence the basis for petitioner's Sixth Amendment challenge to his attorney's performance in this respect was apparent from the trial-court record. Not surprisingly, then, New York state caselaw has consistently required that a Sixth Amendment or equivalent claim based on trial counsel's failure to adequately support a pre-trial suppression motion be asserted on direct appeal. See, e.g., People

46

v. Figueroa, 187 Misc.2d 539, 541-43, 722 N.Y.S.2d 336, 338-39
(Sup. Ct. Bx. Cty. 2001) (finding that defendant's claim of
ineffective assistance based on inadequacy of pre-trial suppression
motion was procedurally barred because the issue had been raised on
direct appeal and it was "clear" that the claim was
"record-based"); see also Baxter v. Conway, 2011 WL 5881846, at *3
(S.D.N.Y. July 29, 2011) (stating that "the pre-trial-motion
component of petitioner's ineffective-assistance-of-counsel claim
involve[d] an issue that [was] well established in the trial
record"); People v. Johnson, 81 A.D.3d 1428, 917 N.Y.S.2d 487 (4th
Dep't 2011) (reviewing on direct appeal ineffective-assistance
claim premised on trial counsel's failure to make certain
suppression motions because such claim was apparent from the trial
record); People v. Wright, 31 A.D.3d 798, 799, 819 N.Y.S.2d 302,
303 (2d Dep't 2006) (finding on direct appeal that ineffective-
assistance claim based on counsel's failure to make a pre-trial
suppression motion was "part of the record and reviewable on direct
appeal"); People v. Walker, 234 A.D.2d 962, 652 N.Y.S.2d 441 (4th
Dep't 1996) (considering on direct appeal defendant's ineffective-
assistance claim based on trial counsel's failure to seek
suppression of evidence seized at the time of arrest and to make
other pre-trial motions); People v. Mangine, 73 A.D.2d 816, 816,
424 N.Y.S.2d 75, 75 (4th Dep't 1979) (finding on direct appeal that

47

certain ineffective-assistance claims based on attorney's failure to make necessary pre-trial motions, including motions for <u>Brady</u> and <u>Rosario</u> material, were without merit, while noting that other ineffective-assistance claims, including those based on the attorney's failing to move to dismiss the indictment for the court's failure to grant a speedy trial and proceeding to trial in the absence of a crucial witness, were appropriately raised in a section 440.10 motion).

### iii. The Procedural-Bar Exceptions

Petitioner does not seek to demonstrate that his appellate attorney's failure to challenge the adequacy of the suppression motion on appeal amounts to cause for procedural-bar purposes. His reticence in this aspect is justified.

There is nothing to suggest that petitioner's failure to raise this Sixth Amendment claim on appeal was attributable to an objective external cause. He retained different counsel on appeal and the factual inadequacy of the suppression motion was apparent from the trial-court record. (<u>See</u> Pet. ¶ 17). Mr. McDowell also cannot invoke ineffective assistance of appellate counsel as cause both because he never asserted such a claim in state court and

48

because such a claim would plainly be meritless. As we discuss
below, see infra pp. 60-77, the appellate attorney had no evident
ground to attack the trial lawyer's performance in this respect
since the record reflects that there was no obvious factual basis
to file a fact-specific and likely meritorious suppression motion.
Petitioner also cannot establish actual prejudice because this
ineffective-assistance claim has no merit, as we explain below. See
id.

   Petitioner also fails to demonstrate that our failure to
consider this claim on the merits would constitute a fundamental
miscarriage of justice. The Supreme Court has expressly stated that
successful invocation of this exception is "rare," that it is to be
applied only in the "extraordinary case," and that it is "tied . .
. to the petitioner's innocence." Schlup, 513 U.S. at 321.

   Mr. McDowell seeks to invoke this exception by suggesting his
actual innocence. (Pet'r's Mem. 29 n.12 (stating that it does not
matter that petitioner's ineffective-assistance claim was denied as
procedurally barred under New York law because "'a petitioner may
obtain review of the [procedurally barred] claim if he demonstrates
that the constitutional violation has probably resulted in the
conviction of one who is actually innocent of the substantive

offense'" (alteration in original) (quoting <u>Dretke v. Hayley</u>, 541 U.S. 386, 393 (2004)))). In light of petitioner's failure to offer any new evidence in support of his actual-innocence claim and the strength of the evidence presented at trial -- especially Ms. Manning's identification testimony -- he cannot successfully assert such a claim of innocence. <u>See</u> <u>Johnson v. Kirkpatrick</u>, 2011 WL 3328643, at *17 (S.D.N.Y. Aug. 3, 2011) (citing cases). As a result, petitioner has not shown that our failure to consider this ineffective-assistance claim would result in a fundamental miscarriage of justice.

### 3. <u>Assessing Respondent's Procedural-Bar Argument: The Expert-Witness Claim</u>

Mr. McDowell's second Sixth Amendment argument is premised on the notion that his trial counsel denied him minimally adequate representation when he failed to consult an identification expert and failed to call one to testify about the limitations of eyewitness testimony. The trial court denied the claim because Mr. McDowell had not raised it on direct appeal.

50

i. Independence

As was the case with Mr. McDowell's complaint about the suppression motion, Justice Pardó found this claim barred by section 440.10(2). The court's decision in this respect was certainly independent since it relied solely on the state procedural rule. (See Resp't's Decl. Ex. L, at 5).

ii. Adequacy

Notwithstanding the deference accorded such state-court decisions, we conclude that the cited state-law ground was inadequate. New York state caselaw did not indicate that petitioner's compliance with § 440.10(2)(c) "was demanded in the specific circumstances presented." Cotto, 331 F.3d at 240. Rather, caselaw and the pertinent circumstances demonstrate that it was appropriate, and indeed necessary, for petitioner to raise this ineffective-assistance claim through a section 440.10 motion, which he attempted to do.

New York courts examining ineffective-assistance claims based on trial counsel's failure to call an expert or other witness have generally held that such claims are properly raised in a section

51

440.10 motion. They base that conclusion on the fact that such an issue inherently involves facts dehors the record, which precludes its being raised on direct appeal. E.g., People v. Radcliffe, 2009 WL 4931863, at *4, 6-10 (Sup. Ct. Bx. Cty. Dec. 18, 2009) (assessing on the merits defendant's section 440.10 ineffective-assistance claim based on trial counsel's failure to present expert testimony on misidentification or to call any negative identification witness; court does not address the possibility that those claims should have been raised on direct appeal); People v. Davis, 2009 WL 3151133, at *2, 10 (Sup. Ct. Bx. Cty. 2009) (reviewing on the merits defendant's section 440.10(1)(h) motion asserting ineffective assistance based on trial counsel's "failing to hire or consult an expert on identification to support [a] misidentification defense"); People v. Perez, 2006 WL 1295858, at *4-6 (Sup. Ct. Kings Cty. Mar. 24, 2006) (reviewing on the merits ineffective-assistance claim based on trial counsel's failure to hire an expert witness, despite defendant's failure to raise the issue on his prior direct appeal, because "ineffective assistance of counsel is generally not demonstrable on the main record" and "[a] motion to vacate the judgment is the appropriate vehicle to raise ineffective assistance, rather than . . . by direct appeal"); see also, e.g., People v. Haynes, 39 A.D.3d 562, 564, 833 N.Y.S.2d 193, 195 (2d Dep't 2007) (citing cases) (finding that defendant's

52

claim of ineffective assistance of counsel, to the extent that it
was premised on trial counsel's failure to investigate and call
certain witnesses, involved matters dehors the record and was
therefore not properly presented on direct appeal); People v.
McDonald, 255 A.D.2d 688, 688, 681 N.Y.S.2d 112, 113 (3d Dep't
1998) (declining to consider on direct appeal defendant's claim of
ineffective assistance based on trial counsel's failure to pursue
an alibi defense, including alibi witnesses, because "it involve[d]
matters that [were] dehors the record").

The tenor of these rulings is not surprising since a lawyer's
decision whether to consult or call a witness raises a number of
factual questions that are unlikely to be answered from the trial-
court record. These questions include: (1) whether a witness was
actually available; (2) whether the lawyer consulted the possible
witness even if he did not call him or her; (3) if so, what the
witness advised the lawyer as to his or her willingness to testify
and what his or her testimony would be; and (4) why the lawyer
chose not to consult or to call the witness. Given this need for
factual development, it is equally unsurprising that habeas courts
in this circuit also generally consider claims of ineffective
assistance based on counsel's failure to call a witness "off-
record" and therefore appropriately raised in a section 440.10

motion. These courts go on to review such claims on the merits even
if the state court previously determined that the claim was clear
on the trial-court record and therefore procedurally barred. See
Chatmon v. Mance, 2010 WL 7768902, at *11 (S.D.N.Y. Apr. 8, 2010)
(holding that ineffective-assistance claim based on trial counsel's
failure to call doctor who treated petitioner as an expert witness
was a "non-record-based" ground; habeas court reviews that claim on
the merits even though New York state court had considered the
claim procedurally barred from review on a section 440.10 motion);
McCollough v. Bennett, 2010 WL 114253, at *7 (E.D.N.Y. Jan. 12,
2010) (citing Bonilla v. Portuondo, 2004 WL 350694, at *3 (S.D.N.Y.
Feb. 26, 2004); Byron, 2008 WL 2795898, at *13) (deciding
ineffective-assistance claim on the merits even though New York
state court had concluded that the claim was procedurally barred
under § 440.10(2)(c); although "it [was] clear from the trial
record that counsel did in fact fail to call a proper foundation
witness," "petitioner's claim inherently involve[d] off-record
assertions and facts" since demonstration of prejudice would
require showings outside of the record); but see Martinez v.
Senkowski, 2008 WL 4501842, at *4 (S.D.N.Y. Sept. 29, 2008) (citing
28 U.S.C. § 2254(e)(1)) (affirming magistrate judge's determination
that petitioner's claims of ineffective assistance of trial counsel
based on counsel's failure to call a witness and engage a

54

handwriting expert were procedurally barred from review because the appellate record was sufficient to permit adjudication of those issues).

Neither respondent's briefing nor Justice Pardó's decision demonstrates that subsection (2) of § 440.10 provides an adequate state procedural bar to petitioner's claim of ineffective assistance for trial counsel's failure to call an expert witness. We find that the section 440.10 court's procedural-default ruling on this claim did not have "a fair or substantial basis in state law," Garcia, 188 F.3d at 78 (citing, inter alia, Arce, 889 F.2d at 1273). Based on the foregoing, we conclude that the court's procedure-based rejection of this ineffective-assistance claim was not adequate to preclude federal habeas review on the merits. Therefore, petitioner is entitled to a de novo review of the merits of his ineffective-assistance claim based on trial counsel's failure to call an expert witness. See Echevarria-Perez v. Burge, 779 F. Supp.2d 326, 339 (W.D.N.Y. 2011); Caston v. Costello, 74 F. Supp.2d 262, 275 (E.D.N.Y. 1999).

IV.   Petitioner's Ineffective-Assistance Claims are Meritless

Neither of petitioner's ineffective-assistance claims support

55

granting him the relief that he seeks.


A. The Applicable Standard of Review


Under the AEDPA, if a petitioner's claim "was adjudicated on the merits in State court proceedings," we can grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented." Bell, 500 F.3d at 154-55 (quoting 28 U.S.C. § 2254(d)). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Id. at 155 (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)). If the state-court disposition was not premised on the merits, then AEDPA deference does not apply, even if "[t]he discussion of the merits was preceded by a contrary-to-fact construction," such as "if the merits were reached, the result would be the same." Id. (holding that a "contrary-to-fact construction" or "contingent observation" is not the same as an alternative holding and therefore not an "adjudication on the merits" for AEDPA purposes).


56

Prior to addressing the merits of petitioner's motion to
vacate, the section 440.10 court stated, "[e]ven _if_ the defendant's
claims _were_ _not_ procedurally barred, the court _would_ still deny his
motion." (Resp't's Decl. Ex. L, at 5 (emphasis added)). This
"contingent observation" uses almost the exact same language as the
example provided in Bell. Then, at the closing of the merits
analysis, the section 440.10 court stated, "[f]or the
abovementioned reasons, the court finds that the defendant's claims
of alleged failures by defense counsel, do not constitute
ineffective assistance of counsel under either the New York State
'meaningful representation' standard" "nor under the federal
objective standard of reasonableness required in Strickland v.
Washington . . . ." (Resp't's Decl. Ex. L, at 13).

In this case, as in Bell, "[t]he state court's ruling on [the]
§ 440 motion discussed the merits and was reduced to a judgment;
but the wording of the opinion reflect[ed] that the disposition was
not premised on the court's view of the merits." Bell, 500 F.3d at
155. The court repeatedly and explicitly relied on the procedural
bar under § 440.10(2) to deny every one of petitioner's
ineffective-assistance claims. For example, the court first
determined that all of petitioner's claims were procedurally barred
under § 440.10(2), and after discussing why each individual claim

57

was procedurally barred, the court reiterated, "as to this ground the motion is [or must be] denied." (Resp't's Decl. Ex. L, at 3-5). At the close of the procedural-bar discussion, the court denied petitioner's motion "in its entirety," citing New York Criminal Procedure Law § 440.10(2). (Id. at 5). Therefore, the state court "explicitly invoke[d] a state procedural bar rule as a separate basis for decision" Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (quoting Harris, 489 U.S. at 264), and we must therefore review petitioner's ineffective-assistance claims de novo. Bell, 500 F.3d at 155.


B. The Sixth Amendment Criteria


To demonstrate ineffective assistance of counsel, a petitioner must show that his lawyer's performance was "so defective that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,'" "and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). As summarized in Brown:

> To satisfy the first, or "performance," prong,

58

> the defendant must show that counsel's
> performance was "outside the wide range of
> professionally competent assistance," and to
> satisfy the second, or "prejudice," prong, the
> defendant must show that "there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the
> proceeding would have been different."

Id. at 79-80 (quoting Strickland, 466 U.S. at 690, 694); accord,

e.g., Smith v. Spisak, Jr., 130 S. Ct. 676, 685 (2010); Palacios v.

Burge, 589 F.3d 556, 561 (2d Cir. 2009); Henry v. Poole, 409 F.3d

48, 62-64 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d

Cir. 2004).

It bears emphasis that the Strickland standard is quite

deferential, and that a claim of constitutional dimension does not

arise unless a lawyer's error is so egregious as to amount to a

failure to provide minimal professional representation. Thus, a

habeas court weighing an ineffective-assistance claim "must judge

the reasonableness of counsel's challenged conduct on the facts of

the particular case, viewed as of the time of counsel's conduct,"

and must "determine whether, in light of all the circumstances,

[counsel's] identified acts or omissions were outside the wide

range of professionally competent assistance." Strickland, 466 U.S.

at 690; accord, e.g., Kimmelman v. Morrison, 477 U.S. 365, 386

59

(1986); <u>Loliscio v. Goord</u>, 263 F.3d 178, 192 (2d Cir. 2001). In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Strickland</u>, 466 U.S. at 690.

The burden of proving prejudice is equally onerous. As noted, the petitioner must demonstrate "a reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." <u>Aparicio</u>, 269 F.3d at 95 (citing <u>Strickland</u>, 466 U.S. at 694).

C. <u>Assessment of the Sixth Amendment Claims</u>

We address the merits of each of petitioner's ineffective-assistance claims in turn.

1. <u>The Motion to Suppress</u>

Prior to petitioner's trial, counsel moved to suppress all physical and other evidence flowing from petitioner's allegedly

60

illegal arrest, notably Mr. McDowell's clothing. (Resp't's Decl.
Ex. P). The trial court denied this motion. Petitioner asserts that
his trial counsel was ineffective because he failed to adequately
support his motion for a <u>Mapp/Dunaway</u> suppression hearing, and
because he failed to renew that motion after learning of additional
evidence that had a potential bearing on probable cause and that
may have entitled petitioner to a suppression hearing.[8] (Pet'r's
Mem. 29-31).

On direct appeal, petitioner argued that the trial court had
erred in denying his motion to suppress without a hearing because
he had set forth a sufficient factual basis to warrant such a
hearing. (Resp't's Mem. 42 (citing Resp't's Decl. Ex. C)). The
First Department affirmed the trial court's ruling, finding that
the suppression hearing was properly denied in light of
petitioner's failure to raise any factual dispute warranting a
hearing. <u>McDowell</u>, 30 A.D.3d at 160, 815 N.Y.S.2d at 570.[9]

---

[8] Counsel learned of this information as a result of his
motion for a bill of particulars and discovery. (Pet'r's Mem. 31
n.13).

[9] In his suppression motion, petitioner asserted that "[t]he
People have given notice that they wish to introduce the
defendant's clothing, which apparently matches a description
given by a witness" and argued that petitioner was not engaged in
criminal activity prior to or during his arrest. (Resp't's Decl.
Ex. P, Part VIII(2), (3)). He did not deny the robbery or raise

Mr. McDowell contends that his attorney could have filed a proper, and meritorious, suppression motion -- presumably one that would have triggered an evidentiary hearing at which he would have demonstrated that the police lacked probable cause to arrest him and seize his clothing. The section 440.10 court concluded that this version of his Sixth Amendment claim was meritless. (Resp't's Mem. 43 (citing Resp't's Decl. Ex. L, at 13)). The court found that even in light of trial counsel's "possible failure" to draft legally sufficient motion papers on the issue of probable cause, petitioner was not prejudiced to such a degree that "the 'fairness of the proceedings as a whole'" was undermined by counsel's error. (Resp't's Decl. Ex. L, at 13 (citing Benevento, 91 N.Y.2d at 713, 674 N.Y.S.2d at 633). Therefore, it rejected the ineffective-assistance argument under both New York and federal law.[10]

Under New York law, a defendant is entitled to a hearing on a motion to suppress if his motion papers, including sworn

_____

"any issues concerning the sufficiency and accuracy upon which [defendant] was arrested," or any other ground for suppression. McDowell, 30 A.D.3d at 160, 815 N.Y.S.2d at 570.

[10] Since New York's ineffective-assistance standard offers an accused more protection than the federal Strickland standard, the court reasoned that a showing that counsel was not ineffective under New York law compelled the same result under federal law. (Resp't's Decl. Ex. L, at 8-9); accord, Rosario v. Ercole, 601 F.3d 118, 126 (2d Cir. 2010).

allegations of fact, either allege "a ground constituting legal basis for the motion" or "do not, as a matter of law, fail to support the ground alleged." N.Y. Crim. Proc. Law § 710.60(1)-(4). According to petitioner, at the time that trial counsel moved for a Mapp/Dunaway hearing, the District Attorney's Office had not yet disclosed the victims' description of the perpetrator, which "apparently formed the sole basis" for Mr. McDowell's detention and arrest. (Pet'r's Mem. 30). Petitioner asserts that trial counsel did not have adequate information at the time of the motion to challenge probable cause for his arrest, and yet he failed to explain that fact to the court and did not request the specific physical descriptions upon which the arrest had been based. (Id.). Petitioner argues that the court denied his motion to suppress based on those omissions. (Id. at 29, 31). He asserts that counsel's assistance was therefore "objectively unreasonable," because the facts later disclosed by the prosecution showed a "clear lack of probable cause" for his arrest under New York state law. (Id. at 31).[11]

---

[11] Respondent notes the tension in petitioner's arguments. Petitioner argued on direct appeal that his suppression motion was sufficient and that the trial court erred in denying it, while he argued in his section 440.10 motion and in this petition that the same motion was so deficient as to amount to ineffective assistance of counsel. (See Resp't's Mem. 42). Petitioner is free, however, to assert whatever arguments might provide a basis for relief. Cf., e.g., Yee v. City of Escondido, Cal., 503 U.S.

In support of his argument, petitioner offers his version of what defense counsel should have done but does not specifically seek to demonstrate prejudice. Although one can infer from petitioner's memorandum that he believes that a different motion would have resulted in suppression, he never substantiates such an argument. (See id. at 29-31).

For purposes of our analysis we assume that a reasonably competent attorney would have waited for the disclosure of the specific facts and then filed a motion to suppress. Although trial counsel in this case did not do so, petitioner fails to demonstrate prejudice from this omission. To demonstrate prejudice in this context requires far more than speculation that, if properly detailed, a suppression motion would have succeed. As one court has recently noted, "in Kimmelman[ v. Morrison], the Supreme Court held that where an ineffective assistance of counsel claim is premised on counsel's failure to make a suppression motion, to satisfy the prejudice prong of Strickland the petitioner must prove that the underlying suppression claim was 'meritorious' and that 'there is a reasonable probability that the verdict would have been different

---

519, 534 ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

absent the excludable evidence . . . .'" <u>Maldonado v. Burge</u>, 697 F. Supp.2d 516, 528 (S.D.N.Y. 2010) (quoting <u>Kimmelman</u>, 477 U.S. at 375). "[I]t is not entirely clear what 'meritorious' means in this context." <u>Id.</u>; <u>see also</u> <u>Kimmelman</u>, 477 U.S. at 375 (stating that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice"). "The weight of the authority and the logic of <u>Kimmelman</u> suggest that petitioner must show, at minimum, a reasonable probability that the suppression motion would succeed, and quite possibly that the suppression motion would in fact succeed." <u>Maldonado</u>, 697 F. Supp.2d at 528; <u>see also</u> <u>Parisi v. Artus</u>, 2010 WL 4961746, at *6 (E.D.N.Y. Dec. 1, 2010).

Petitioner fails to make the requisite showing. "It is well settled that a police officer may arrest a person for a crime without first obtaining a warrant where there is 'reasonable cause to believe that such person has committed such crime, whether in [the officer's] presence or otherwise.'" <u>People v. Surico</u>, 265 A.D.2d 596, 597, 697 N.Y.S.2d 356, 357 (3d Dep't 1999) (alteration

in original) (citing N.Y. Crim. Proc. Law § 140.10(1)(b)); <u>People</u>
<u>v. Rivera</u>, 50 A.D.3d 458, 459, 855 N.Y.S.2d 502, 504 (1st Dep't
2008) ("To sustain a finding of probable cause to arrest, the
evidence must show that the police possessed of information that
would lead a reasonable person to conclude it was more probable
than not that a crime had been committed, and, that the person
being arrested defendant was the perpetrator."). New York courts
have recognized that "reasonable cause" in this context has
substantially the same meaning as "probable cause" under the Fourth
Amendment. <u>Id.</u> (quoting <u>People v. Willsey</u>, 144 A.D.2d 106, 107, 534
N.Y.S.2d 445, 446 (3d Dep't 1988)); <u>see also</u> <u>Dion v. City of Utica,</u>
<u>N.Y.</u>, 2005 WL 1174065, at *4 (N.D.N.Y. May 10, 2005) (quoting
<u>Roberts v. New York</u>, 753 F. Supp. 480, 483 (S.D.N.Y. 1990)); <u>People</u>
<u>v. Johnson</u>, 66 N.Y.2d 398, 403 n.2, 497 N.Y.S.2d 618, 621 n.2
(1985).


    The facts that are pertinent to our assessment of what
petitioner could have shown on a fully documented suppression
motion, and its prospects for success, are: (1) the victims'
description of the perpetrator; (2) the extent to which petitioner
matched that description upon his arrest; and (3) the location and
other circumstances of his interaction with law enforcement prior
to his arrest. Ultimately, Mr. McDowell cannot show any likelihood

that his hypothesized motion would have succeeded.

On the incident date, the victims described the perpetrator as a black male, about 5'8" tall, weighing about 170 pounds, and wearing a white baseball cap, beige slacks, and an untucked checkered beige shirt. (Tr. 326, 408-09, 501-02, 508-09). This description was quite detailed, specifying his race, sex, height, and weight, and provided a particular description of every visible article of clothing that he was wearing. On the night of his arrest, Mr. McDowell was wearing a white baseball cap, a checkered beige and white shirt, and beige or khaki pants. (Tr. 334, 415-16, 423, 501). His shirt was baggy and untucked. (Tr. 418). In short, his clothing at the time of his arrest closely matched the description offered by the victims. Clothing aside, there is no evidence in the record that Mr. McDowell's height, weight, or physical appearance differed in any significant respect from the descriptions that the victims initially offered.

The trial record reflects two aspects of petitioner's appearance that his attorney appeared to suggest were different from the victims' account, but both differences appear to be negligible. First, the cap that Mr. McDowell was wearing at the time of his arrest -- although white, as described -- featured a

67

prominent Yankees emblem. (Tr. 505). Ms. Manning did not deny that the assailant could have been wearing a Yankees hat, but she admitted that if he had been wearing a hat with such an emblem, she "didn't notice it." (Tr. 505-06). Second, in his closing, defense counsel argued that Mr. McDowell appeared to have had a "full beard" in a picture taken the night of his arrest. (Tr. 590-91). Counsel noted that this fact was absent from the victims' description, and that petitioner would not have been able to grow such a beard during the three short days prior to his arrest. (Id.). However, at trial, there was no testimony suggesting that the assailant lacked facial hair. Quite to the contrary, Ms. Manning described the assailant as having had facial hair "like a beard, mustache," which she told police. (Tr. 509). When shown a photograph of Mr. McDowell that was taken during the initial line-up, Ms. Manning said that his shirt, facial hair, and "face" resembled that of the robber. (Tr. 512). Mr. Bearden also testified that the assailant had a "partial beard" with some "hair down the side of his cheek." (Tr. 368-69). However, he would not describe the assailant's facial hair as "full beard."[12] (Tr. 369). In short,

---

[12] Detective Hernandez testified that the victims had described the perpetrator as having facial hair, but that they did not specifically mention a beard. (Tr. 473-74). Justice Goodman limited this hearsay testimony to impeachment purposes. (Id.).

neither of these inconsequential discrepancies reflects any
compelling reason to question the reasonableness of the decision to
arrest Mr. McDowell.

The location of Mr. McDowell's initial contact with the police
bolsters the probable-cause decision of the arresting officer. The
robbery occurred in Highbridge Park, located along Edgecombe and
St. Nicholas Avenues between 155th and 158th Streets. (Tr. 362-63,
487). It is unclear exactly where in the park the victims were
located, except that the assailant walked north from their location
to the 157th Street exit after the robbery. (Tr. 366, 393, 490-91).
Officers escorted Mr. McDowell to the 33rd Precinct for questioning
after they noticed him sitting on a park bench at 155th Street and
Edgecombe Avenue, very near the spot where the robbery had taken
place. (Tr. 350-51, 414-15, 421).

Based on these facts and the governing probable-cause
standards, there is no reason to believe that the trial court would
have suppressed petitioner's clothing or the identification
testimony even if trial counsel's motion had raised issues of fact
warranting a hearing. Of particular note on this issue is the First
Department's decision in People v. Harmon, 293 A.D.2d 303, 739
N.Y.S.2d 710 (1st Dep't 2002), affirming a conviction of first-

degree robbery and fifth-degree criminal possession of stolen property. Id. at 303, 739 N.Y.S.2d at 710. In doing so, the appellate panel upheld the trial court's denial of defendant's suppression motion. Id. The victims of a series of robberies had described the assailant as a black man in his twenties, weighing 170 to 175 pounds, approximately 5'9" tall, with a "pencil-thin" beard and mustache, wearing a down camouflage jacket adorned with a white circle on the left breast. Id. Defendant moved to suppress his jacket, wool cap, the money that the police had confiscated following his arrest, and two subsequent line-up identifications, on the ground that they were all the fruits of an illegal arrest. See Br. for Def.-Appellant at 3-4, People v. Harmon, 293 A.D.2d 303, 739 N.Y.S.2d 710 (1st Dep't 2002) (No. 2002-00703), 2001 WL 36090830, at *3-4. At the suppression hearing, defense counsel argued that the victims' description did not provide probable cause to arrest defendant because "a thin beard and mustache was common and . . . the black ski cap and the camouflage jacket, during the month of January [was] not so extraordinary . . . [or] so particularized that one week later you would arrest and detain a person." Id. at 10 (alteration in original) (internal quotation marks omitted). Counsel also noted that one of the complainants had viewed a photo array prior to defendant's arrest and had identified someone else as the assailant. Id. Following the hearing, the trial

70

court denied defendant's motion to suppress. Id. at 11-12.

The First Department affirmed the trial court's decision, holding that the "description [of defendant] was sufficiently specific to provide the police with probable cause to arrest [him]," "particularly since [he] was arrested in the general vicinity of the crimes" -- approximately five blocks away -- "and at approximately the same time of day as the crimes," even though he was not arrested until seven days after the crimes had occurred.[13] Harmon, 293 A.D.2d at 303-04, 739 N.Y.S.2d at 710; see also Br. for Def.-Appellant at 11-12, Harmon, 293 A.D.2d 303, 739 N.Y.S.2d 710 (No. 2002-00703). The court noted that "the passage of time did not render it less than probable that defendant was the perpetrator." Harmon, 293 A.D.2d at 304, 739 N.Y.S.2d at 710. Moreover, the court so ruled despite the facts that the "defendant was not observed engaged in any criminal or suspicious activity . . ." at the time of his arrest, and that defendant did not possess any of the stolen items when he was initially searched by the police. See Br. for Def.-Appellant at 2, Harmon, 293 A.D.2d 303,

---

[13] Defendant was wearing black pants, a black cap, and a camouflage jacket with a white circle above the breast pocket upon his arrest. He also had a thin beard and moustache, stood 5'9", weighed an estimated 170 to 175 pounds, and was African-American. See Br. for Def.-Appellant at 6-7, Harmon, 293 A.D.2d 303, 739 N.Y.S.2d 710 (No. 2002-00703).

71

739 N.Y.S.2d 710 (No. 2002-00703). Finally, the First Department held that the "People were not required to prove that defendant's jacket was unique. The jacket was sufficiently distinctive, when coupled with the balance of the description and the surrounding circumstances." Harmon, 293 A.D.2d at 303, 739 N.Y.S.2d at 711.

The facts in Harmon are strikingly similar to those in the present case -- a suspect was arrested based on a multi-victim description that specified the assailant's race, sex, height, build, and clothing; his physical appearance at the time of arrest, particularly his clothing, closely matched the descriptions that the victims provided; moreover, the suspect was apprehended in the vicinity of the crime at approximately the same time of day that the crime occurred, while not engaged in suspicious activity, and in spite of a nonproductive initial search. In addition, petitioner was arrested only three days after the robbery, as opposed to the seven that had passed in Harmon.[14]

---

[14] Although state appellate courts occasionally reverse trial-court denials of suppression motions, these decisions are readily distinguishable from Harmon and from this case. For example, in People v. Waters, 259 A.D.2d 642, 686 N.Y.S.2d 798 (2d Dep't 1999), the Second Department reversed the trial court and granted defendant's motion to suppress physical evidence and statements because the panel found that the police had lacked probable cause to arrest defendant. Id. at 643, 686 N.Y.S.2d at 798. The court found that probable cause could not rest on the "extremely vague description" of the assailants -- "two black men

72

wearing dark clothing" -- and the assailants' flight after being approached by the officer, even though the men were found less than a mile from the scene of the robbery and only forty-five minutes after the crime. Id. at 643-44, 686 N.Y.S.2d at 798-99. In People v. Riddick, 110 A.D.2d 787, 787, 487 N.Y.S.2d 855, 856 (2d Dep't 1985), the appellate court found that there was no probable cause to arrest defendant. The radio report of the robbery on which the arresting officers had relied had described the assailants as "two black males armed with a knife, one wearing white pants and the other a blue shirt. . . ." Id. at 788, 487 N.Y.S.2d at 856. As the officers cruised near the crime scene, they came across defendant, a black man wearing a blue shirt, walking with another black man who was wearing white pants. The officers stopped and searched them both, finding nothing suspicious. The men were then arrested. The Second Department held that the officers did not have probable cause to arrest defendant based on the "meager," "general" description of the perpetrators, the lack of defendant's suspicious behavior, and the fruitless search. Id. at 788, 487 N.Y.S.2d at 857. Finally, in People v. Simpson, 174 A.D.2d 348, 570 N.Y.S.2d 810 (1st Dep't 1991), an officer at Canal Street subway station received a radio report at about 5:30 P.M. of a robbery that had occurred at 10:45 A.M. at Chambers Street. The report described the assailants as "a white male, over six feet tall, wearing dark clothing and a black male, approximately 40 years of age." Id. at 349, 570 N.Y.S.2d at 811. The officer at Canal Street took note of two men because the description of one -- the defendant -- matched the description of one of the perpetrators, and because they "broke eye contact with him, sat down on a bench and glanced in his direction." Id. The officer called his command district for an update on the description and was told that the black suspect was short and the "white" suspect might be Hispanic. Id. The officer then approached the two men and frisked the defendant, finding a syringe. Id. at 349, 570 N.Y.S.2d at 812. He arrested the defendant, who was identified by a complainant at a subsequent line-up. Id. The trial court determined that defendant's arrest was based on probable cause and denied his suppression motion. Id. The First Department reversed, finding that the initial description that the officer had received was "too general, vague and stale to render it more probable than not that they were the individuals who committed the robbery," and that the suspects' behavior was too equivocal to elevate suspicion to the level of probable cause. Id. at 350-51, 570

73

Petitioner cites various cases in support of the proposition that "failure to bring appropriate pre-trial motions may demonstrate ineffective assistance of counsel." (Pet'r's Mem. 29 (emphasis added)). None, however, salvages his claim. The case first cited, Henderson v. Cowan, 200 F.3d 995, 998-1000 (7th Cir. 2000), held that trial counsel's moving for severance on an incorrect ground "failed to come up to a minimum standard of professional competence." While an attorney might be found incompetent for bringing an inappropriate pre-trial motion, petitioner must show that counsel was ineffective in these particular circumstances and that he was prejudiced as a result.[15] Petitioner also invokes People v. Jones, 95 N.Y.2d 721, 723

---

N.Y.S.2d at 812-13.

These cases all differ from Harmon and the current case in one or more critical respects. First, the victims in Harmon and here offered more specific descriptions of the perpetrator. Second, the defendants in both cases closely matched the victims' descriptions. Third, the defendants were found in close proximity to the site of the crime at around the same time of day as the crime, and in this case only three days later.

[15] Petitioner cites Kirby v. Illinois, 406 U.S. 682, 690 (1972) for the proposition that an accused is entitled to counsel under the Sixth Amendment at any "critical stage of the prosecution" and Mempa v. Rhay, 389 U.S. 128, 134 (1967), which examined Supreme Court precedent and determined that the cases "clearly stand for the proposition that appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected" -- particularly sentencing. Insofar as these cases support such a proposition, we agree that petitioner had the right to effective assistance of counsel both in bringing his pre-trial suppression motion and throughout his trial.

74

N.Y.S.2d 761 (2001), one of the cases that the Appellate Division cited in affirming his conviction. (Pet'r's Mem. 30-31). Jones held that a defendant may establish a basis for a suppression hearing by suggesting grounds for suppression, which can include deficiencies in the description of a suspect that was provided to an arresting officer. Jones, 95 N.Y.2d at 727, 723 N.Y.S.2d at 1058-59. Although the reviewing court cited this case as an example of an argument that counsel may have been able to raise in his suppression motion, that comment does not go so far as to say that if trial counsel had made such an argument, the trial court would have granted his motion for a suppression hearing -- which is what petitioner seems to suggest (see Pet'r's Mem. 30-31) -- much less that the suppression motion would have succeeded after a hearing.

Petitioner also contends that if a hearing had been granted, the court would have suppressed his clothing and any post-seizure identifications. Petitioner first cites People v. Skrine, 125 A.D.2d 507, 507, 509 N.Y.S.2d 589, 590 (2d Dep't 1986), to show that defense counsel should have renewed his suppression motion after learning that the sole basis for petitioner's arrest was the descriptions offered by Mr. Bearden and Ms. Manning, because such information was supposedly legally insufficient to establish probable cause. (Pet'r's Mem. 31). In support of this argument,

petitioner references the police canvass -- asserting that the police and the victims passed by several men who they thought matched the description of the assailant during a police canvass after the robbery. (E.g., Tr. 510). However, this case can be distinguished from Skrine and the related cases that petitioner cites because the victims in this case quickly realized that the individuals whom they had approached were not the assailant, and that they were only "partial matches" of the victims' description (wearing the same color hat or pants) (e.g., Tr. 410). Moreover, the police apprehended Mr. McDowell in almost the exact location where the robbery occurred. Cf. Skrine, 125 A.D.2d at 507, 509 N.Y.S.2d at 590 (finding that defendant's motion to suppress physical evidence should have been granted because the arresting officer testified that many individuals in the group from which defendant was arrested matched the description provided to him by the undercover officer, and the arresting officer "could not recall at the [suppression] hearing whether the defendant was the only person who met the complete description given by the undercover officer"); People v. Lane, 102 A.D.2d 829, 830-31, 476 N.Y.S.2d 365, 368 (2d Dep't 1984) (finding that "the only remaining possible basis" for defendant's arrest was the descriptions of the assailant given by the complainant and an eyewitness to the police and that "the somewhat vague, general description given by the victim and

76

eyewitness" alone, which defendant did not exactly match, "failed to establish probable cause to arrest the defendant"); <u>People v. Dodt</u>, 61 N.Y.2d 408, 416, 474 N.Y.S.2d 441, 445-46 (1984) (finding that at the suppression hearing the prosecutor had offered no evidence of probable cause to arrest defendant because he did not provide evidence of (1) the physical description contained in the teletype that the arresting office used to identify defendant's car, (2) defendant's appearance, or (3) the extent to which defendant's appearance matched that of the alleged assailant).

In sum, Mr. McDowell fails to demonstrate a reasonable probability that a suppression motion drafted in the manner he describes or a request to renew the motion after learning certain identification evidence would have been granted and would have affected the outcome of the trial. (<u>See</u> Pet'r's Mem. 29-31); <u>see also</u> <u>Brown</u>, 124 F.3d at 79-80 (quoting <u>Strickland</u>, 466 U.S. at 690, 694). Having failed to make this showing, petitioner cannot demonstrate that trial counsel's performance in filing a suppression motion was so deficient as to violate his Sixth Amendment right to counsel.

B. <u>The Absence of Expert Testimony Regarding the Reliability of Eyewitness Identification</u>

Because this case "hinged entirely on a questionable identification," petitioner asserts, "trial counsel's failure to present expert testimony regarding the reliability of eyewitness identifications amounted to ineffective assistance of counsel." (Pet'r's Mem. 32). In support of this argument, he alleges that there "were a variety factors that called into question Ms. Manning's identification of Mr. McDowell" and therefore "a reasonable defense attorney would have retained an expert on witness identification to assist the jury." (<u>Id.</u>). He continues, "given the questionable circumstances surrounding the identification, there was no downside to the decision to call such a witness, or at least to consult with one." (<u>Id.</u> at 34).

To sustain this claim, petitioner would have to show either (1) that trial counsel unreasonably failed to consider consulting an expert, or (2) that trial counsel did consult an expert, but did not call one, (3) that that expert was prepared to provide specific, useful testimony in support of his case, (4) that the trial court would have admitted such testimony, and (5) that the testimony likely would have affected the outcome of his trial. <u>See</u>

78

<u>Ferrell v. United States</u>, 2011 WL 1496339, at *4 (S.D.N.Y. Apr. 20, 2011) (citing <u>Escobar v. Senkowski</u>, 2005 WL 1307939, at *19 (S.D.N.Y. May 26, 2005)) (explaining that "to demonstrate prejudice from counsel's alleged failure to call a witness, the petitioner must at least demonstrate that the witness was able to testify and would have testified in a manner beneficial to the petitioner"); <u>Curry v. Burge</u>, 2007 WL 3097165, at *13-15 (S.D.N.Y. Oct. 23, 2007) (discussing reasonableness standard with regard to trial counsel's investigation into calling potential witnesses); <u>see also</u> <u>Carr v. Senkowski</u>, 2007 WL 3124624, at *21 (W.D.N.Y. Oct. 23, 2007) (gathering cases to support the proposition that "petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result"); <u>Montalvo v. Annetts</u>, 2003 WL 22962504, at *27 (S.D.N.Y. Dec. 17, 2003) (quoting <u>Cromwell v. Keane</u>, 2002 WL 929536, at *24 (S.D.N.Y. May 8, 2002)) ("'a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice'"). Mr. McDowell fails to carry his burden since he shows only that no expert was called to testify at his trial.

79

Petitioner states that trial counsel "fail[ed] to recognize [eyewitness expert] testimony's significant value" to petitioner's defense, and asserts that the "failure to present or investigate potentially exonerating testimony, including expert witnesses" amounts to ineffective assistance. (Pet'r's Mem. 33). However, there is no evidence of trial counsel's purported failure to investigate the possibility of retaining an expert, including evidence that counsel did not "at least" consult an expert. (See id. at 33-34).

We note that "[a] decision by trial counsel not to call a witness, if made for tactical reasons, usually cannot sustain an ineffectiveness of counsel claim." Akwuba v. United States, 2005 WL 2249775, at *16 (S.D.N.Y. Apr. 26, 2005) (citing United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002); United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (citing United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997))); see also Savinon v. Mazucca, 2005 WL 2548032, at *33 (S.D.N.Y. Oct. 12, 2005) (quoting Stapleton v. Greiner, 2000 WL 1207259, at *16 (E.D.N.Y. July 10, 2000) (citing United States v. Kirsch, 54 F.3d 1062, 1072 (2d Cir. 1995))) (stating that "[c]ourts have held that 'the decision whether or not to call an expert witness generally falls within the wide sphere of strategic choices for which counsel will not be second-guessed on

80

habeas review'"). However, if "counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under <u>Strickland</u>'s prejudice prong." <u>Savinon</u>, 2005 WL 2548032, at *33 (quoting <u>Benjamin v. Greiner</u>, 296 F. Supp.2d 321, 330 (E.D.N.Y. 2003)) (internal quotation marks omitted). "'[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" <u>Batchilly v. Nance</u>, 2010 WL 1253921, at *36 (S.D.N.Y. Apr. 2, 2010) (quoting <u>Strickland</u>, 466 U.S. at 690-91).


There is no indication in either the section 440.10 motion or the habeas petition that trial counsel gave less than reasonable consideration to hiring an expert. Mr. McDowell also offers no evidence that such an expert was available or that he would have testified favorably if called. No affidavits or similar showings from potential witnesses were provided to the section 440.10 court or to us. Therefore, we cannot say whether expert testimony, if admitted, would have been helpful to the defense, much less whether it would have been sufficiently compelling to call into question the outcome of the trial. <u>See</u>, <u>e.g.</u>, <u>People v. Lopez</u>, 2006 WL

81

3962056, at *8 (Sup. Ct. Bx. Cty. Dec. 21, 2006) (denying
ineffective-assistance claim that was premised in part on counsel's
failure to call various expert witnesses; defendant did not provide
an affidavit from any expert to support his "bald assertion that
favorable testimony could have been provided," and "without an
affidavit . . . swearing to the facts that [the experts] would have
testified to . . . it [was] pure speculation to conclude that they
were readily available or could have provided any favorable
testimony").

     Furthermore, there is no reason to assume that Justice Goodman
would have admitted the expert testimony. As the section 440.10
court recognized (Resp't's Decl. Ex. L, at 11), the leading
jurisprudence on point at the time of petitioner's trial was People
v. Lee, 96 N.Y.2d 157, 726 N.Y.S.2d 361 (2001), which held that
although "expert testimony [regarding the issue of the reliability
of eyewitness identification] [was] not inadmissible per se, the
decision whether to admit it rest[ed] in the sound discretion of
the trial court." 96 N.Y.2d at 162, 726 N.Y.S.2d at 364. The Lee
court held that in considering whether to admit expert testimony
concerning the reliability of an identification, the trial court
should consider "whether the proffered expert testimony 'would aid
a lay jury in reaching a verdict.'" Id. (citing People v. Taylor,

75 N.Y.2d 277, 288, 552 N.Y.S.2d 883 (1990)). The Court of Appeals ultimately found, in light of corroborating evidence and circumstances of the crime that suggested ample opportunity to view the perpetrator, that the trial court had not abused its discretion in denying defendant's motion to introduce expert testimony regarding the reliability of eyewitness identification. Id. at 163, 726 N.Y.S.2d at 365.

Petitioner principally relies on People v. LeGrand, 8 N.Y.3d 449, 835 N.Y.S.2d 523 (2007), in asserting that the expert testimony would have been admitted. While this case established that such expert testimony is scientifically accepted, and that in some circumstances "it would be an abuse of a court's discretion to exclude expert testimony on the reliability of eyewitness identifications," id. at 456, 835 N.Y.S.2d at 528, it did so five years after petitioner's trial. (See Resp't's Mem. 44).[16]

---

[16] In LeGrand, the Court of Appeals reiterated its central holdings from Lee regarding admissibility of eyewitness expert testimony -- that the trial court: (1) must exercise its discretion in deciding whether to admit eyewitness expert testimony; (2) should weigh a defendant's request to admit expert testimony against factors such as the centrality of the identification issue and the existence of corroborating evidence; (3) should consider whether jurors would benefit from such testimony; and (4) might need to determine whether such testimony is generally accepted in the scientific community. LeGrand, 8 N.Y.3d at 455-59, 835 N.Y.S.2d at 527-30. Although the LeGrand decision did not necessarily alter Lee's holding, it demonstrates

Caselaw following <u>Lee</u> demonstrates that New York trial courts did indeed exercise their discretion in deciding not to admit eyewitness expert testimony except in fairly compelling circumstances -- notably cases in which the identification evidence was weak. <u>See</u>, <u>e.g.</u>, <u>People v. Paccione</u>, 295 A.D.2d 451, 743 N.Y.S.2d 727 (2d Dep't 2002) (affirming trial court's denial of defendant's mid-trial application to call an eyewitness identification expert under <u>Lee</u> because counsel failed to persuade the court that the jurors would have benefitted from the specialized knowledge of an expert); <u>People v. Carrieri</u>, 4 Misc.3d 307, 307-08, 777 N.Y.S.2d 627, 628 (Sup. Ct. Queens Cty. 2004)

_____

the Court of Appeals' recognition of the increased acceptance of certain forms of such expert testimony in both the judicial and the scientific communities. The <u>LeGrand</u> court specified circumstances in which a court must admit expert testimony on the reliability of eyewitness identification. The court held "that where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror." <u>Id.</u> at 452, 835 N.Y.S.2d at 524-25. Further, the court held that three factors potentially affecting the reliability of eyewitness identification were generally accepted by the scientific community: the correlation between confidence and accuracy of identification, the effect of post-event information on accuracy of identification and confidence malleability. <u>Id.</u> at 458, 835 N.Y.S.2d at 529.

(denying defendant's motion to call an expert with regard to the accuracy of cross-racial identification in a single-witness robbery case because that information fell "within the ambit of jurors' general knowledge and life experience . . . as well as due to its questionable scientific validity;" court notes that "[w]hile <u>People v. Lee</u> . . . permits expert testimony regarding the accuracy of identification testimony, the issue of expert testimony relating to cross-racial identification continues to be problematic and the use of cross-racial jury instructions remains controversial"); <u>People v. Radcliffe</u>, 196 Misc.2d 381, 764 N.Y.S.2d 773 (Sup. Ct. Bx. Cty. 2003) (allowing defendant to present an eyewitness identification expert where identification was the principal issue, a single witness identified the assailant, there was no corroborating evidence, and the identification was cross-racial so the testimony would be "helpful" to the jury); <u>People v. Smith</u>, 191 Misc.2d 765, 768-69, 743 N.Y.S.2d 246, 249 (Sup. Ct. N.Y. Cty. 2002) (using the <u>Lee</u> test to determine the admissibility of expert testimony and admitting eyewitness expert testimony because there was no corroborating evidence, the opportunity to observe the defendant was limited -- one complainant described the viewing as lasting "a few seconds" and another saw the perpetrator "from a distance of approximately twenty feet," the robberies were extremely stressful because they were carried out at knife point, the line-up

85

identifications of defendant were made one-and-one-half and three-and-one-half months after the incidents, four out of the six eyewitnesses did not select defendant from the line-up, and one of the intended witnesses made a negative identification from a photo array).[17]

Although petitioner cites various facts in support of his

------

[17] Petitioner also cites Young v. Conway, 2009 WL 249740, at *2 (W.D.N.Y. Feb. 3, 2009) as an example of a court granting a habeas petition because expert testimony regarding the reliability of eyewitness identification was improperly excluded. (See Pet'r's Mem. 33 ("Indeed, just this year, the Western District of New York granted a habeas petition on the grounds that such eyewitness testimony had been improperly excluded.")). However, petitioner misstates the relief granted in Young. The court only permitted petitioner to amend his petition to include a claim of ineffective assistance of appellate counsel based on that counsel's failure to raise the trial court's refusal to allow petitioner to "introduce expert witness testimony on the reliability of eyewitness identification" as a Sixth Amendment issue. Young, 2009 WL 249740, at *1-2. The court granted such relief because petitioner's ineffective-assistance claim was not "plainly without merit." Id. at *2. The court noted that its "research reveal[ed] a trend towards finding admissible expert testimony regarding the reliability of eyewitness identifications," citing a Third Circuit decision that had "held that expert testimony regarding accuracy and reliability of eyewitness identification evidence, which was [the] primary basis upon which defendant had been convicted, would have been helpful to the trier of fact, and thus could not be excluded at trial, since human perception and memory was inherently unreliable and defendant did not have any physical scientific means of exonerating himself." Id. (citing United States v. Brownlee, 454 F.3d 131, 140-42 (3d Cir. 2006)). Young also cited to People v. LeGrand in support of its holding, but again, that case was decided more than five years after defendant's suppression motion and trial.

contention his case required an eyewitness-identification expert, this is not a case where identification evidence was weak or lacking in corroboration. The record reflects that at the time of the robbery: (1) the sun had set, but Ms. Manning testified that it was not dark enough for the park lights to have come on (Tr. 545)[18]; (2) it was light enough for Ms. Manning to be able to see an individual on a bench farther from her than the one next to where she was sitting (Tr. 545); (3) Ms. Manning, who was wearing her contact lenses at the time of the robbery, giving her "almost 20/20" vision, testified that she looked the perpetrator in the eye multiple times during the robbery (Tr. 485, 501, 543-44); (4) Ms. Manning gave the police a "more complete description" of the perpetrator (Tr. 433); and (5) in twenty seconds or less, Ms. Manning identified petitioner as the perpetrator from a line-up only three days after the crime. (Tr. 517). Moreover, the victims gave the police a detailed description of the robber's appearance, particularly his clothing, and Mr. McDowell was found to match that description. Any discrepancies in the victims' descriptions of the perpetrator (Tr. 367-68, 507) and Mr. Bearden's failure to choose petitioner from the line-up (Tr. 378-80, 399, 462) merely emphasize the point that Ms. Manning was best suited to make an accurate

-------------------------------

[18] We note that Mr. Bearden testified that the park lights had come on by this time. (Tr. 368).

identification of the perpetrator -- and, indeed, she is the victim who identified petitioner.

These facts suggest that any expert testimony regarding the reliability of eyewitness testimony was unlikely to be helpful to defendant or a jury, and unlikely to affect the outcome of the trial. Nothing about the circumstances surrounding the robbery suggests that an expert was needed to assist the jury in understanding the potential shortcomings of the victims' identifications -- Ms. Manning, who is the same race as Mr. McDowell (e.g., Tr. 324),[19] testified that she had had a good opportunity to view the assailant during the robbery and that she

---

[19] This fact is relevant insofar as it defeats any concern that Mr. McDowell's conviction may have been based on a questionable cross-racial identification. Cf., e.g., People v. Williams, 14 Misc.3d 571, 577-78, 589-90, 830 N.Y.S.2d 452, 457-58, 467 (Sup. Ct. Kings Cty. 2006) (admitting eyewitness-identification expert testimony concerning, inter alia, cross-racial identification -- specifically that "people are better at identifying members of their own race than those from other races;" court finds that such testimony is generally accepted by the scientific community and is likely to assist the jury); Radcliffe, 196 Misc.2d at 385-88, 764 N.Y.S.2d at 776-78 (admitting expert testimony concerning the "heightened opportunity for error" in a cross-racial identification because it could assist the jury in evaluating the reliability of the victim's identification where (1) defendant's identification was "the principal issue," (2) a single eyewitness provided the only identification evidence, (3) that evidence was uncorroborated by any other evidence, and (4) the fact that the identification was cross-racial was "a critical factor" in the identification process).

was confident in her identification of petitioner at the line-up, there was nothing specifically stressful about the robbery, no weapon was shown, the victims were not attacked, there was no indication that Ms. Manning felt any pressure to identify a perpetrator based on widespread media attention, and the jurors had ample opportunity to weigh Ms. Manning's testimony against Mr. Bearden's. Petitioner was also found in clothing virtually identical to those that the victims had described, just three nights after the crime, and in very close proximity to where it had occurred. Cf. Carrieri, 4 Misc.3d 307, 777 N.Y.S.2d 627 (denying defendant's request for expert testimony concerning cross-racial identification in one-witness robbery case in part because such information fell within the ambit of the jurors' "general knowledge and life experience" and because counsel could "alert the jury to the likelihood of erroneous cross-racial identifications during cross-examination and summation"); People v. Trinidad, 188 Misc.2d 324, 325-26, 728 N.Y.S.2d 905, 906 (Sup. Ct. Kings Cty. 2001) (denying indigent defendant's request for an identification expert based on Lee because there was "no basis to conclude that [the] expert identification evidence would be relevant or necessary to assist the jury in their evaluation of the testimony by the eyewitnesses" where (1) defendant allegedly attempted to rob four individuals at gunpoint; (2) two of the victims recalled seeing the

89

defendant the evening of the incident at the same party that they attended; (3) three of the victims had identified the defendant through post-arrest line-ups and photo arrays; (4) and those identification procedures had been deemed to not have been unduly suggestive at a pre-trial Wade hearing); People v. Drake, 188 Misc.2d 210, 211-15, 728 N.Y.S.2d 636, 637-40 (Sup. Ct. N.Y. Cty. 2001) (granting defendant's motion to allow expert witness testimony concerning eyewitness identification, relying on the same cases as the Lee court, because that testimony would "benefit the jury by providing the framework for it to evaluate the accuracy and reliability of the eyewitness testimony" where (1) the degree of violence and stress resultant from the relevant assault was "especially great;" (2) the incident had received extensive media attention; and (3) the victim's identification was cross-racial).[20]

---

[20] The one factor pertinent to Ms. Manning's identification that an expert may have aided the jury with understanding was her admitted confidence in her identification of petitioner at the line-up. (Tr. 558). However, in People v. Smith, 2004 WL 690321 (Sup. Ct. N.Y. Cty. Mar. 26, 2004), the court declined to admit expert testimony regarding the low correlation between an eyewitness's confidence in his or her identification and the accuracy of that identification after an extensive analysis of that subject's empirical history and its shortcomings. Id. at *2, *4-7, *9. A federal habeas court in a different case found that the state court's decision to omit such testimony was harmless error, concluding that it "could have helped the jury understand the counter-intuitive relationship between confidence and reliability." Smith v. Smith, 2003 WL 22290984, at *12-14 (S.D.N.Y. Sept. 29, 2003). However, in both of those cases, an expert was identified, available, and willing to testify to the

Petitioner also cites to several Second Circuit cases for the proposition that "federal courts, including those in this Circuit" have long voiced concern with the reliability of eyewitness testimony. (Pet'r's Mem. 32-33 (citing, <u>inter alia</u>, <u>Lyons v. Johnson</u>, 99 F.3d 499, 504 (2d Cir. 1996) (affirming District Court's grant of habeas petition based the state trial court's failure to allow petitioner to present certain evidence in support of his misidentification defense where he and another individual at the crime scene were of the same race and similar build, both were wearing black jackets, and different eyewitnesses identified each as the assailant, and commenting that "this court has noted on more than one occasion that eyewitness testimony is often highly inaccurate" and that "[t]here can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial"))). While the cases cited demonstrate that the Second and Third Circuits have acknowledged certain shortcomings of eyewitness testimony, they do not suggest that the

---

proposition stated. Although the <u>LeGrand</u> court held that the correlation between confidence and accuracy of identification was scientifically valid evidence in eyewitness-identification cases, it did so five years after Mr. McDowell's trial, and such a determination does not compel its admittance. 8 N.Y.3d at 458, 835 N.Y.S.2d at 529. It is also highly unlikely that Ms. Manning's single statement regarding her confidence in the line-up identification was outcome determinative at petitioner's trial.

trial court would have admitted expert testimony in Mr. McDowell's case or that such expert testimony would have affected the result in that case. Cf. Lopez v. Fischer, 2006 WL 2996548, at *1-9 (S.D.N.Y. Oct. 16, 2006) (holding that it was within the trial court's discretion to exclude expert-witness testimony regarding eyewitness identification in four-witness multiple-robbery case because the circumstances presented "a standard instance of eyewitness identification without any unusual factors" even though a gun was brandished in all of the robberies and "even without an expert witness, the defense was able to attack the prosecution's identification through cross-examination, and the trial court charged the jury on various factors to take into account when assessing witness testimony"); Perez v. Greiner, 2003 WL 22427759, at *15 (S.D.N.Y. Oct. 23, 2003) (denying habeas petitioner's ineffective-assistance claim based on failure to call an expert on the reliability of eyewitness testimony, because such testimony "would not have aided the jury" where the perpetrator and eyewitness complainant were the same race and there was no evidence that the eyewitness observed a weapon, so "expert testimony about the various factors affecting eyewitness observations would have added little beyond the credibility challenges that . . . counsel raised through cross-examination").

Based on the foregoing, petitioner fails to demonstrate that Justice Goodman would have allowed an expert to testify. Petitioner additionally fails to show how such hypothesized expert testimony would have affected the trial if it had been admitted, especially considering Ms. Manning's compelling identification. (See Resp't's Mem. 45).

"Courts have traditionally relied upon cross-examination and jury instructions as mechanisms to alert the jury to any inaccuracies or inconsistencies in the testimony of an eyewitness." Perez, 2003 WL 22427759, at *14. Trial counsel pursued a reasonable strategy in his cross-examination of prosecution witnesses. He sought to demonstrate that the witnesses' descriptions of defendant, upon which petitioner's arrest was based, were unreliable. He went to great lengths to emphasize the shortcomings of Mr. Bearden's testimony and to attack the credibility of Ms. Manning's identification testimony. (E.g., Tr. 386 (Mr. Bearden was not wearing glasses during the robbery); 391 (Mr. Bearden's vision becomes blurry about a foot away from his face when he is not wearing his glasses, and he did not put on his glasses during the robbery); 395-96 (Mr. Bearden did not admit that he did not get a good look at the perpetrator because he was embarrassed by his emotional state); 399 (Mr. Bearden did not choose petitioner from

93

the line-up); 422, 475 (petitioner did not possess any of the stolen property at the time of his arrest); 527-28 (Mr. Bearden and Ms. Manning were having an emotional conversation at the time of the robbery); 545 (the sun had set before the robbery)). Petitioner was convicted despite these efforts. Furthermore, if an expert had testified for the defense, the prosecution might have called a persuasive rebuttal expert, or the jury simply might not have agreed with the defense theory of the case even with the support of an expert opinion.

In any event, in the absence of a specific proffer of what an expert would have said that might be relevant to Mr. McDowell's case, petitioner cannot show that he was prejudiced by counsel's decision not to call such an expert. Cf. Kelly v. Lempke, 2011 WL 2227174, at *12 (S.D.N.Y. Apr. 7, 2011) (finding that petitioner had provided no evidence to support his assertion that an expert would have reached a conclusion favorable to petitioner, and, as a result, his ineffective-assistance claim was entirely speculative); Brown v. Fisher, 2010 WL 3452372, at *8-9 (S.D.N.Y. Apr. 29, 2010) (citing cases) (refusing to find trial counsel's failure to call an expert insufficient assistance when (1) counsel tried to suppress the identification through a Wade hearing; (2) counsel cast doubt on eyewitnesses' credibility and the reliability of their

94

identifications through cross-examination at trial; and (3) "petitioner provide[d] no explanation as to how . . . presenting expert testimony would have influenced the jury"). "[A] defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate." <u>Erbo v. United States</u>, 2009 WL 2460998, at *4 (S.D.N.Y. Aug. 12, 2009) (quoting <u>Strickland</u>, 466 U.S. at 695).[21]

---

[21] In resisting this conclusion, petitioner notes that "[c]ourts have held that the failure to present or investigate potentially exonerating testimony, including expert witnesses, may amount to ineffective assistance of counsel." (Pet'r's Mem. 33 (citing cases)). However, none of the cases he cites bears directly on the issues in the present case. Petitioner first cites <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), to demonstrate that the court can find ineffective assistance where counsel fails to "investigate mitigating evidence." (Pet'r's Mem. 33 (citing <u>id.</u> at 390-399)). In <u>Williams</u>, a death-penalty case, the court found trial counsel ineffective under <u>Strickland</u> because counsel did not thoroughly investigate defendant's background or offer available mitigating evidence to the sentencing jury (including evidence that defendant was "borderline mentally retarded" and did not advance beyond sixth grade in school). <u>Williams</u>, 529 U.S. at 396-97. In this case, petitioner does not present, nor do we discern, any piece of mitigating evidence that counsel overlooked, and petitioner offers no example beyond speculation of what specific testimony an expert might have offered at trial.
    Petitioner next cites <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003). The <u>Wiggins</u> court found trial counsel ineffective under <u>Strickland</u> because the scope of counsel's investigation into defendant's background fell short of prevailing professional standards in capital cases. <u>Id.</u> at 523-38. Again, petitioner offers no evidence of any deficiencies in the scope of trial counsel's investigation. (<u>See</u> Pet'r's Mem. 33-34).
    In <u>State v. Aeh</u>, 1997 WL 771044 (10th Cir. Dec. 11, 1997), the court determined that defense counsel's failure to call a rebuttal expert witness "could rise" to the level of ineffective

95

CONCLUSION

For the reasons discussed above, we recommend that the writ be denied and the petition dismissed.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard Owen, Room 650, 500 Pearl Street, New York, New York 10007-

---

assistance of counsel and remanded for an evidentiary hearing because a potential defense rebuttal expert submitted an affidavit with the habeas petition that indicated that he had reached a conclusion contrary to that of the state's expert, the expert testimony concerned an issue related to the sole issue at trial, and the inculpatory evidence in the case was less than overwhelming. Id. at *2-4. Not only is this Tenth-Circuit case not controlling, but it is also off-point. Unlike the petitioner in Aeh, Mr. McDowell does not provide the court with affidavits or other evidence to demonstrate not only that an expert was available to testify, but also that he would have testified to that which petitioner speculates.

    Finally, in Commissioner v. Legg, 551 Pa. 437, 711 A.2d 430 (1998), the court concluded that trial counsel was ineffective for failing to present expert testimony available at the time of the murder trial that indicated that petitioner suffered from major depression and anxiety that would have prevented her from rationally forming the specific intent to kill. Id. at 433-35, 711 A.2d at 443-48. This case is not only not controlling, but it also concerns complex exculpating medical evidence in a capital case, the probative value of which may not have been apparent to the trier of fact without an expert's assistance.

1312, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 470 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED:     New York, New York
           March 14, 2012

                        RESPECTFULLY SUBMITTED,


                        _____
                        MICHAEL H. DOLINGER
                        UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Order have been sent today via U.S. Mail to:

Harvey Kurzweil, Esq.
George Eric Mastoris, Esq.
Dewey & LeBoeuf, L.L.P.
1301 Avenue of the Americas
New York, NY 10019

Paul Bernard Lyons, Esq.
New York State Office of the Attorney General
120 Broadway
New York, NY 10271